UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2002 DEC 10 P 2: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.

RECEIPT # 43902
AMOUNT $ 150
SUMMONS ISSUED 12
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 12-10-02

MARY JANE CALLAHAN,
Individually and as
Administratrix of the Estate of
John B. Callahan,
KATHLEEN ELLEN PHELPS,
PATRICK SHAWN CALLAHAN,

    Plaintiffs,

      v.

UNITED STATES of AMERICA,
JOHN J. CONNOLLY, JR.,
JOHN M. MORRIS,
H. PAUL RICO,
ROBERT FITZPATRICK,
JAMES A. RING,
JAMES GREENLEAF,
JAMES AHEARN,
JAMES J. ("Whitey") BULGER,
STEPHEN J ("The Rifleman") FLEMMI,
JOHN V. MARTORANO, and
JOHN DOES, Nos. 1-50,

    Defendants.

      )
      )
      )
      )

# 02 - 12372 RCL

## COMPLAINT FOR RELIEF AND JURY DEMAND

## I.  INTRODUCTION

1.   On August 2, 1982, John B. Callahan was found in the trunk of his Cadillac at the Miami International Airport. He had been shot to death.  A day or two earlier Callahan had flown to Fort Lauderdale where he was met by John



Martarano.  On March 20, 2001, nearly nineteen years later,
John Martarano pled guilty to having committed this murder.

2.   At that time, Callahan was a married father of two.

3.   John Callahan graduated Boston College cum laude in
1967.  He was a highly successful accountant, who joined
Arthur Anderson in 1968.  He became a junior partner in
1970 and worked on mergers and acquisitions.

4.   In 1974 Callahan was recruited to prepare World Jai
Alai for sale.  He was its Chief Executive Officer and
received a salary of $100,000.00 (one hundred thousand
dollars) per year.  Among his duties at World Jai Alai,
John Callahan hired personnel and fired those who were
incompetent and stole from the company.

5.   Among the hirings mentioned in the preceding paragraph
was H. Paul Rico.  Rico's background working for the
Federal Bureau of Investigation convinced Callahan that he
was the perfect choice to head security.

6.   In 1978, John Callahan's efforts succeeded.  World Jai
Alai was sold to Telex.  John Callahan had returned to
Boston however in 1976.

7.   Approximately three years later, John Callahan learned
that various individuals with no readily apparent ties to
World Jai Alai had in fact been skimming profits.
Complaints of this activity fell on deaf ears.

8. Almost simultaneously, Tulsa businessman Roger Wheeler was murdered in Oklahoma. Callahan, fearing a connection to Wheeler's knowledge of profit skimming voiced his concerns to Rico. A federal investigation of the Wheeler murder then turned to Callahan for information. Notwithstanding efforts to assuage his fears, Callahan persisted and continued to express his concerns. Not long thereafter John B. Callahan met his demise.

9. As is only now becoming clear, the murder was actually one in a series of brutal slayings, all arising out of a long and sordid business relationship between two notoriously violent career criminals on the one hand, and federal law enforcement, on the other.

10. It became known, in March, 2001, that the gunman was John V. Martorano, a career criminal and notoriously violent member of the Boston-based Winter Hill Gang ("Martorano"). He did this on orders from, and under the direction and control of James J. (aka "Whitey") Bulger and Stephen J. (aka "The Rifleman") Flemmi, the organizers and leaders of the Winter Hill Gang.

11. The murder does not, however, come to rest solely with Bulger, Flemmi or the Winter Hill Gang: The circumstances underlying Mr. Callahan's murder, as is only recently coming to light over the government's earlier denials, have

3

their origins years before the murder and regrettably,
reach deeply into the confines of Boston's most senior,
trusted federal law enforcement office.

12.   For years leading up to the Callahan murder, the
Boston Office of the Federal Bureau of Investigation
(variously, "FBI-Boston," the "Bureau," or the "Agency")
had maintained an illicit (or, in the government's words,
"special") relationship with members of the Winter Hill
Gang, specifically Bulger and Flemmi.   More particularly,
the Agency sought out and recruited both Bulger and Flemmi
to serve as informants in the Bureau's "Top Echelon"
informant program.   The Agency did so in its dogged pursuit
of, and efforts to investigate, penetrate and bring down,
the Boston branch of La Cosa Nostra ("LCN"), otherwise
known as "the Mafia."

13.   FBI-Boston ultimately succeeded in its years-long
efforts to eradicate LCN-Boston.   In the course of doing so
however, the Agency repeatedly violated its own rules and
regulations as regards, among others, obtaining, handling
and processing sensitive law enforcement information; it
repeatedly violated its own informant Guidelines, and the
Informant Guidelines of the Department of Justice, the
federal agency with oversight responsibility for the FBI;
and it repeatedly cast aside or ignored many of the laws it

4

had sworn to uphold and enforce.  In essence, in the course of pursuing what it believed to be its primary law enforcement objective, the FBI itself became a "violator of the law."

14.  Regrettably, these circumstances are not without precedent:  One federal court, assessing the FBI's, and thus the government's, responsibility for looking on, and taking no action, while its informants remained tied to the many beatings and other harms done to the "Freedom Riders" of the Civil Rights era of this country, put it this way:

> 28 U.S.C. §533 describes the duty of the FBI to maintain law and order, i.e., not only to investigate, but to prosecute federal crimes….This duty is especially applicable in this case where the FBI's informants were involved in the criminal activity….When the government disregards the directives of [Section 522], either through omission or commission, and allows itself to become embroiled in a lawless scheme and then does nothing to prevent that scheme from injuring innocent citizens, it is joining the forces of the unjust in contravention of the majestic purposes which underscores this nation's system of justice.

> Bergman v. United Sates, 565 F. Supp. 1353, 1404 (W.D. Mich, 1983)(Enslen, J.)(emphasis supplied).

15.  This Complaint closely tracks the findings of fact and rulings of law made by the United States District Court for the District of Massachusetts (Wolf, J.) issued at the conclusion of more than two years of testimony and other

contested evidence in this matter. See "Memorandum and Order" reported at United States v. Salemme, 91 F. Supp.2d 141 (D. Mass. 1999). Further, this Complaint hereby incorporates by reference certain related facts and circumstances set forth in United States v. Kevin P. O'Neil, James J. Bulger and Stephen J. Flemmi, 99-10371-RGS, and United States v. John J. Connolly and Stephen Flemmi, 99-10428-JLT. The former Indictment charges Bulger, and Flemmi with, among others, Racketeering Conspiracy ("Count One"), and substantive Racketeering ("Racketeering Act Number Sixteen"), two predicate acts of which are conspiracy to murder John B. Callahan, and the murder of John B. Callahan.

16. The latter Indictment charges: that (former FBI Special Agent and contact agent, or "handler," for Bulger and Flemmi) John Connolly was a member of a "criminal enterprise" also including Bulger and Flemmi; that the enterprise "acted to protect James Bulger, Stephen Flemmi… from arrest and prosecution for criminal activities including murder," and that is "acted to facilitate those criminal activities of Bulger, Flemmi and their associates." Indictment at Para. 13 ("Purpose of the Enterprise").

17.  From these detailed, carefully-made judicial findings
and the governmental admissions (made, in part, by way of
the foregoing Indictments), the heart of the matter is
this:  The Bureau reached out, cultivated and nurtured its
relationships with Bulger and Flemmi.  The FBI repeatedly
and routinely protected Bulger and Flemmi from prosecution
for their ongoing criminal activities.  Certain employees
of the Agency, motivated at least in part to serve the
interests and advance the ends of the Agency, wrongfully
sought to conceal from other law enforcement authorities,
and from others within the Agency itself, Bulger's and
Flemmi's crimes.  They did this to protect and to preserve
Bulger and Flemmi's status as Agency informants.  For
example, Connolly - with the knowledge and assistance of
Supervisory Special Agent John Morris, Connolly's direct
supervisor - tipped Bulger and Flemmi to the identity of
confidential law enforcement informants, who were, in turn,
seeking to cooperate against Bulger and Flemmi.  Connolly -
with Morris' knowledge and assistance - provided Bulger and
Flemmi with confidential law enforcement information
regarding grand jury investigations, court-authorized
electronic surveillance, and other investigative efforts,
and deflected and squelched investigations and prosecutions
of their many crimes.  Connolly, and others at the Agency,

knowingly, intentionally and repeatedly omitted material information from official FBI documents regarding Bulger and Flemmi.  Connolly, and others at the Agency, knowingly, intentionally and repeatedly failed to report information relating to Bulger and Flemmi, which information was, in turn, material to the investigation of criminal activity generally in the Boston area.

18.  This pattern and repeated practice of acts, omissions and other wrongful conduct on the part of Connolly, Morris and other law officers employed by the Agency served to create a long-lasting protective shield around Bulger and Flemmi, a protective shield which, as Bulger and Flemmi came to appreciate and to routinely exploit, provided numerous opportunities, and thus emboldened them, to carry on their criminal activities, including crimes of violence and threatened violence, including murder, extortion and loan-sharking.  The United States is thus vicariously liable to Plaintiffs where the intentional and otherwise wrongful acts and omissions on the part of Connolly and Morris and certain other law enforcement officers of the United States Government, acting within the scope of their respective offices and employment proximately caused and/or substantially contributed to the murder of John B. Callahan and the relate harms complained of herein.

19.   The Agency is also directly liable for Callahan's murder and related harms, where these harms fell within the ambit of foreseeable risk created by the Agency's breach of its own duty of care, such duty arising from the combined facts and circumstances of its long-standing illicit ("special") relationship with Bulger and Flemmi.   The Agency, and more particularly Connolly, Morris and certain of the supervisory staff of the Agency, variously knew or in the exercise of reasonable care, should have known of the exceedingly violent criminal histories and propensities of Flemmi, Bulger and other members of the Winter Hill Gang.   Before Mr. Callahan's murder and while actively serving as FBI informants (approximately 1965 to August, 1982), Bulger and Flemmi, individually and jointly, were responsible for at least two dozen Boston-area murders and countless acts of violence and other crimes.

20.   The Agency breached its duty of due care by, among others, knowingly and intentionally failing to observe the dictates of Agency and Department of Justice statutes, informant Guidelines and other Agency rules and regulations then in effect with respect to criminal informant activity, and/or negligently allowing the illicit relationship, and its resultant "protective shield" to take place in the first instance, and to continue thereafter, unabated.   This

direct negligence on the part of FBI-Boston, including its supervisory staff, proximately caused and/or substantially contributed to John Callahan's murder in August of 1982 and the suffering and other grievous harms that resulted from that brutal act.

21.   Plaintiffs, individual members of the Callahan family and, by its Administratrix, the Estate of John B. Callahan (the "Callahan Estate"), therefore bring this action for legal damages and equitable relief by way of claims under, *inter alia*, the First (right of access to courts); Fourth (right to be secure in person); and Fifth (right of access to courts and deprivation of life) Amendments to the U.S. Constitution, and claim of conspiracy to deprive Decedent, Plaintiffs and the Callahan Estate of these constitutional rights.   Plaintiffs also bring claims under the Massachusetts "Wrongful Death" Act, M.G.L., c. 229 and the common law of the Commonwealth of Massachusetts, such state-created claims advanced, in turn, by way of the waiver of sovereign immunity set out in the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. ("FTCA").   These claims for legal damages and other relief are brought, variously, against the United States; certain named (former) Special Agents and Supervisory Special Agents of FBI-Boston (each such federal agent known hereinafter as a

10

"Federal Defendant;" certain of these agents and the United States sometimes known hereinafter collectively as the "Federal Defendants"); the Agency's former Top Echelon informants - James J. Bulger and Stephen J. Flemmi; and another notoriously violent member of the Bulger Group - and Mr. Callahan's immediate killer - John V. Martorano.

## II.  **PARTIES**

22.  Mary Jane Callahan, in her capacity as Administratrix of the Estate of John B. Callahan, brings this action on behalf of the Callahan Estate is subject to the jurisdiction of the District Court of Massachusetts.  The administratrix is duly appointed and authorized to commence this action on behalf of the Callahan Estate.

23.     Plaintiff, Kathleen Ellen Phelps is a citizen of Arlington, Massachusetts, and the daughter of John B. Callahan and Mary Jane Callahan.

24.  Plaintiff, Patrick Shawn Callahan, is a citizen of Felton, California and the son of decedent, John B. Callahan and Mary Jane Callahan.

25.  Plaintiff, Mary Jane Callahan, is a citizen of Burlington, Massachusetts and the widow of John B. Callahan.

26.  The United States is a defendant herein pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671 et

seq. ("FTCA"), arising from the international and/or
negligent and/or other wrongful acts and/or omissions of
employees and agents of the Federal Bureau of Investigation
("FBI"), an agency of the United States pursuant to 28
U.S.C. § 533 and 28 &U.S.C. § 2671 et seq., while such
agents and employees were acting within the scope of their
office or employment as law enforcement officers of the
United States government.

27.  Defendant H. Paul Rico ("Rico") is, on information and
belief, a resident of Florida. During the relevant times
alleged in this Complaint, Rico was acting within the scope
of his office or employment as a Special Agent of the FBI.
Rico is sued individually and in his (former) official
capacity.

28.  Defendant John M. Morris ("Morris") is, on information
and belief, a resident of Niceville, Florida.  During the
relevant times alleged in this Complaint, Rico was acting
within the scope of his office or employment as a Special
Agent of the FBI.  Rico is sued individually and in his
(former) official capacity.

29.  From 1970 until in or bout December 1995, Morris was
an FBI Special Agent.  From approximately March 1972 until
approximately November 1991, Morris was assigned to the
FBI's Boston field office.  For much of that time, Morris

was a supervisory special agent, and, between December 1977 and January 1983 was the direct supervisor of John J. Connolly, Jr. on the FBI-Boston's Organized Crim. Squad ("C Squad").

30.   Defendant, John J. Connolly, Jr. ("Connolly") is a resident of Lynnfield, Massachusetts.  During the relevant times alleged in this Complaint, Connolly was acting in the scope of his office or employment as a Special Agent of the FBI.  Connolly is sued individually and in his (former) official capacity.

31.   From November 1968 to December 1990, Connolly was a Special Agent of the FBI.  From February 1973 until his retirement in December 1990, Connolly was assigned to the Boston Office of the FBI.

32.   Defendant Robert Fitzpatrick ("Fitzpatrick") resides in Rhode Island, at a location presently unknown.  During the relevant times alleged in this Complaint, Fitzpatrick was acting within the scope of his office or employment as a Supervisory Special Agent of the FBI.  Fitzpatrick is sued individually and in his (former) official capacity.

33.   Defendant James Ring ("Ring") is, on information and belief, a resident of Boston, Massachusetts.  During the relevant times alleged in this Complaint, Ring was acting within the scope of his office or employment as a special

agent of the FBI.  Ring is sued individually and in his (former) official capacity.

34.  In or about January 1983, Ring became the supervisory Special Agent of the Organized Crime Squad for the Boston Office of the FBI.  Ring retired from the FBI in or about 1990.

35.  Defendant James Greenleaf (Greenleaf") is, on information and belief, a resident of Scarborough, Maine. During the relevant times alleged in this Complaint, Greenleaf was acting within the scope of his office or employment as a Supervisory Special Agent of the FBI. Greenleaf is sued individually and in his (former) official capacity.

36.  Greenleaf was the FBI Special Agent in charge of the Boston Office commencing in November 1982.  Greenleaf served FBI-Boston in that capacity until December 1986.

37.  Defendant James Ahearn ("Ahearn") resides in a location presently unknown.  During certain times alleged in this Complaint Ahearn was acting within the scope of his office or employment as a Special Agent of the FBI.  During other relevant times alleged in the Complaint, Ahearn was Special Agent in Charge of the Boston FBI Office.  Ahearn is sued individually and in his (former) official capacity.

38. Defendant James J. Bulger ("Bulger" a/k/a "Whitey"), whereabouts currently unknown, is a life-long resident of South Boston, Massachusetts. For all relevant periods alleged in the Complaint, Bulger was a leader/organizer of the Winter Hill Gang, a criminal enterprise that, for decades in and around Boston, engaged in sustained, significant criminal activity, including murder, drug trafficking, bribery, extortion, loan sharking, and illegal gambling (variously, the "Winter Hill Gang" or "Bulger Group").

39. FBI-Boston officially opened Bulger as a confidential informant ("CI") for the FBI in 1975; one year later, the Agency elevated Bulger to Top Echelon Informant ("TE Informant") status.

40. As a consequence of a tip from Connolly, Bulger is now a fugitive from justice. The United States has charged Bulger, and others, with Racketeering Conspiracy for, among others, the murder of John Callahan (*United States v. O'Neil*, 99-CR-10371-RGS, Count One (Racketeering Conspiracy) and Racketeering Act Number Sixteen ("Murder of John Callahan")(Superseding Indictment)).

41. Defendant Stephen J. Flemmi ("Flemmi"), former resident of Boston, Massachusetts, and now in federal custody, also was a member of the Winter Hill Gang. In or

about September 1980, Connolly officially registered Flemmi as a confidential informant for the FBI.

42.   Flemmi has also been indicted for Racketeering Conspiracy for, among others, the murder of John Callahan, *United States v. O'Neil*, 99-10371-RGS, Count One (Racketeering Conspiracy).

43.   Defendant John V. Martorano ("Martorano"), a former resident of Boston, Massachusetts and now in federal custody, also was, at times relevant to this Complaint, a member of the Winter Hill Gang.

44.   John Does Nos. 1 through 50 are persons, presently unknown to Plaintiffs, who violated Decedent's and Plaintiffs' rights as guaranteed by the United States Constitution and/or Massachusetts law and/or conspired with others to do so, and otherwise bear responsibility for the harms complained of herein.  The John Does may be private individuals, state officials or law enforcement officers of one or more states and/or the United States Government who acted in concert with the Federal Defendants, to deny Decedent and Plaintiffs their respective rights as guaranteed by the United States Constitution and under Massachusetts law.

III. **JURISDICTION AND VENUE**

45.  This case is brought to recover damages from the
Federal Defendants for harms cause while those Federal
Defendants were acting under color of law of the United
States of America, to wit, depriving Decedent and
Plaintiffs of their respective rights as guaranteed by the
United States Constitution.

46.  Jurisdiction is grounded upon 28 U.S.C. § 1331,
because this case arises under the Constitution of the
United States.

47.  This action also seeks recovery of damages under the
Federal Tort Claims Act, 28 U.SC. §2671, et seq., where the
intentional, negligent or otherwise wrongful acts or
omissions of certain employees of the United States, acting
within the scope of their office or employment, proximately
caused or substantially contributed to the harms complained
of herein, all under circumstances where the United States,
if a private person, would e liable to Plaintiffs in
accordance with the laws of the Commonwealth of
Massachusetts.

48.  Jurisdiction is thus also grounded upon 28 U.S.C. §
1346, where the Complaint brings claims for relief under
the Federal Tort Claim Act, 28 U.S.C. § 2671, et seq.
("FTCA").

49.   The jurisdiction of this Court is founded upon 28 U.S.C. § 1367, because the Complaint states causes of action so related to claims falling within the original jurisdiction of this Court such that these claims form part of the same "case or controversy" as that term has meaning under Article III of the United States Constitution.

50.   On May 14, 2002, Plaintiffs, by and through counsel, presented to FBI-Boston, their Administrative Claims for Relief (the "Administrative Claims"), pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. §2401, and 28 C.F.R. §14.1 et seq.

51.   The United States has failed to make final disposition of any of the foregoing Administrative Claims within six months from the date the claims were presented.  Plaintiffs elect to treat these claims as having been "finally denied." 28 U.S.C. §2675.

52.   Venue is proper in the District of Massachusetts under 28 U.S.C. §1391(b), where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Massachusetts.

## IV.   THE ESTATE OF JOHN CALLAHAN

53.    As alleged above, on August 2, 1982, in Miami, Florida, and at the behest of Bulger and Flemmi, Martorano ambushed and murdered John Callahan.

54.     On or about November 3, 1982, the Probate Court of Middlesex County, Massachusetts, McGovern, J., appointed Mary J. Callahan Administratrix of the Estate of John Callahan.

55.     John Callahan was, at the time of his murder, a resident of Winchester, Massachusetts, and thus a citizen of the United States.  Callahan was thus entitled to the protection of the Constitution and the laws of the United States of America.

56.     At relevant times alleged herein, certain of the Federal Defendants acted under color of the laws of the United States of America, and/or were conspiring, as alleged, with or otherwise acting in concert with, persons who were acting under color of laws of the United States of America.

57.     Plaintiffs have no effective means of obtaining relief from the many violations of Decedent's rights, and the Plaintiffs' respective rights, secured to them under the United States Constitution.

58.     There are no special factors counseling hesitation in this Court's power to formulate remedies for Plaintiffs and the Callahan Estate.

19

## V.   ALLEGATIONS OF FACT COMMON TO ALL COUNTS

### A.   The Federal Bureau of Investigation

59.   The Federal Bureau of Investigation is, for purposes of the FTCA, a "Federal agency."  28 U.S.C. § 2671.  more particularly, the FBI is a federal law enforcement agency statutorily empowered by the United States Congress to investigate, enforce and prosecute violations of the United States Criminal Code  28 U.S.C. §533.

60.   The FBI is a constituent agency of the U.S. Department of Justice and is subject to oversight and direction by the Attorney General of the United States.   The above enabling statute affirmatively obligates the FBI to "transmit and detection of federal crimes to the Department of Justice," and to "uphold the laws of the United States and prevent the laws from being violated."

61.   Among the offenses that the FBI is empowered to investigate are crimes involving racketeering (including murder as an act of racketeering), 18 U.S.C. §1962, et seq.; bribery, 18 U.S.C. §201; loan sharking, 18 U.S.C. §891; gambling, 18 U.S.C. §1955; obstruction of justice, 18 U.S.C. §1501 et seq.; interference with commerce by threat, 18 U.S.C. §1951; tampering with a witness, victim or an informant, 18 U.S.C. §1512; and retaliating against a witness, victim or informant, 18 U.S.C. §1513.

62.   Further, by way of mission statement, the FBI has publicly articulated certain "core values" that "need to preserved and defended by the FBI in performing its statutory missions.   Those values are: rigorous obedience to the Constitution of the United States; respect for the dignity of all those we protect; compassion; fairness; and uncompromising personal and institutional integrity."

63.   The FBI mission statement further provides that "[r]espect for the dignity of all whom we protect reminds us to wield law enforcement powers with restraint and to recognize the natural human tendency to be corrupted by power and to become callous in its exercise.   Fairness and compassion ensure that we treat everyone with the highest regard for the constitution, civil and human rights. Personal and institutional integrity reinforce each other and are owed to the nation in exchange for the sacred trust and great authority conferred upon us."

**B.   The Attorney General's Guidelines and FBI Rules and Regulations Governing Suitability, Use and Handling of Informants**

64.   In 1976, former Attorney General of the United States Edward H. Levi established guidelines relating to the FBI's handling of its informants.   Those guidelines were part of a larger effort by the Attorney General and others under his direction and control, to establish standards and

21

procedures aimed at putting an end to years of serious abuses, involving use of confidential informants, by the FBI.

65.   During relevant times in this Complaint, FBI Director Clarence Kelley admitted that some of these FBI activities had been "clearly wrong and quite indefensible."  Director Kelly further declared that the Bureau should never again occupy the "unique position that permitted improper activity without accountability."

66.   On December 15, 1976, Attorney General Levi issued a memorandum to the Director of the FBI that described basic standards and procedures for the FBI's use of informants in Domestic Security, Organized Crime, and other criminal investigations (the "Levi Memorandum").  On January 12, 1977, the Justice Department saw to it that the Levi Memorandum was incorporated into the FBI "Manual of Instructions" issued to all FBI agents (the "FBI Manual").

67.   The Levi Memorandum mandated that "special care be taken not only to minimize [informants] use but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law.  Informants as such are not employees of the FBI, but the special relationship of an informant to the FBI imposes a special responsibility upon the FBI when the informant

engages in activity where he has received, or reasonably thinks he has received encouragement or direction for that activity from the FBI (emphasis supplied)."

68.   The Levi Memorandum further mandated that "[t]he FBI may not use informants...for acts...which the FBI could not authorize for its undercover agents."

69.   The FBI Manual in turn, mandated that "[u]nder no circumstances shall the FBI take any action to conceal a crime by one of its informants."  This directive was regularly disregarded concerning Bulger and Flemmi.

70.   Pursuant to the FBI Manual, if the Agency had reason to believe that one of its informants had violated the law in furtherance of providing assistance to the FBI, the FBI would "ordinarily" promptly inform the appropriate law enforcement or prosecutive authorities, and the FBI would then decide whether the continued use of the informant was justified.

71.   If there were exceptional circumstances that caused the FBI to believe that such notification was "inadvisable", the FBI was nonetheless duty-bound, under the Levi Memorandum, to inform the Department of Justice of these facts and circumstances.  The Department of Justice would then decide whether law enforcement or prosecutive

23

authorities should be notified and whether the FBI should continue to use the informant.

72.   The Agency likewise routinely disregarded this directive concerning Flemmi and Bulger.

73.   The Levi Memorandum also established the same procedures where the FBI had "knowledge" that one of its informants had committed a "serious" crime "unconnected with his FBI assignment."   The Agency also regularly disregarded this directive, as concerned Flemmi and Bulger.

74.   In 1981, the Department of Justice revised the Guidelines, to clarify the rules in those circumstances where there was a perceived need of FBI informants to engage in criminal activities in order to obtain important information.   Under these Guidelines, "ordinary criminal activity" was to be authorized by an FBI field office supervisor or higher FBI official.   "Extraordinary criminal activity," which included conduct involving a "significant risk of violence," was to be authorized only upon notice to, and approval given by both the Special Agent in Charge of the Field Office ("SAC"), and the United States Attorney.

75.   The Agency regularly disregarded this directive as concerned Bulger and Flemmi.

### C.   The Insidious Relationship between Defendants Rico and Flemmi

76.   Beginning in the 1960s, the Bureau has made it uniformly clear to its agents and supervisory agents, that development of Top Echelon informants was a high priority. FBI senior management routinely regarded, and made it known to line agents and supervisory agents alike, successful development of informants generally, and therefore Top Echelon informants particularly, as an important achievement for an FBI agent.  The development of such an informant had the potential to affect, both significantly and positively, the progress of an agent's career.  The Bureau made it clearly known that it as to the agent's benefit to develop Top Echelon informants.

77.   In November 1965, (then) FBI Special Agent H. Paul Rico was a member of FBI-Boston's OC Squad.  In that capacity, Rico targeted Flemmi for development as a top echelon informant – the highest status a source can achieve in the FBI.  At that time, a Top Echelon informant was defined as an individual who "could provide a continuous flow of quality criminal intelligence information regarding the leaders of organized crime."

78.   Rico knew that FBI policies and procedures required that all information received from informants had to be

recorded on an FBI Form 209. During all times alleged herein, Rico failed and refused to conform to these policies and procedures.

79. Rico sought to realize Flemmi's potential as a source of information by not treating him like a criminal who, in turn, should be used with caution to obtain valuable information. Rather, Rico suggested that he and Flemmi were allies in a common cause, primarily a war against the LCN.

80. Rico promised Flemmi that if he served as an FBI informant, the FBI would protect him.

81. Flemmi was receptive to the alliance with the FBI that Rico proposed. The arrangement offered him an opportunity to use the FBI to disable his enemies, enhance his safety and, with the competition diminished and the protection of the FBI, make his own criminal activities more profitable.

82. Agents of the FBI, including Connolly and Morris, engaged in a pattern of false statements being placed in Flemmi's informant file in order to divert attention from his crimes and/or FBI misconduct.

83. On February 8 1967, Flemmi was designated as a Top Echelon informant.

84. When designating Flemmi as a Top Echelon informant, Rico wrote, with regard to Flemmi's past activities that he

had "been engaged in bookmaking, shylocking, robberies, and a suspect of possibly being involved in gangland slayings."

85.  Rico had an incentive not to document accurately or completely information about Flemmi's possible involvement in serious crimes because he (Rico) believed that he might lose the authority to utilize Flemmi as an informant, if Rico's Agency superiors decided that Flemmi deserved to be targeted for continued criminal prosecution, rather than used as a source.

86.  Rico's suspicions that Flemmi was a murderer did not deter him and the FBI from making Flemmi a Top Echelon informant and an ally in pursing their investigation of the LCN.

87.  In addition to promising "protection" Rico said, in various ways, that Flemmi would not be prosecuted for crimes he was committing while serving as an informant.

88.  Rico caused Flemmi to understand that the FBI would overlook Flemmi's criminal activity as long as he was providing information on the LCN.

89.  Flemmi has since been indicted and charges are pending, in which it is alleged that in addition to other crimes in 1967, Flemmi participated in the murders of Wimpy Bennett, his brothers, Walter and William Bennett, and Richard Grasso.  United States v. Flemmi, 94-10287-MLW,

27

Fourth Superseding Indictment.  Flemmi has also been indicted and charges are pending in which it is alleged that in addition to other crimes, Flemmi participated in the murders of Debra Davis, Thomas King, John McIntyre, Arthur Barrett, Deborah Hussey, Richard Castucci, Roger Wheeler, John Callahan, James Sousa and Edward Connors. United States v. O'Neil, 99-CR-10371, Superseding Indictment.

90.  Although Rico and his FBI colleagues often worked closely with State investigators and prosecutors in organized crime matters, FBI-Boston did not contribute to any investigation of Flemmi regarding the murders of the Bennetts or Grasso.

91.  On or about January 30, 1968, Attorney John Fitzgerald was crippled, but not killed, by a bomb that exploded as he started his car.  At the time, Attorney Fitzgerald was representing a witness who was providing information about organized crime activities.  The Middlesex County District Attorney took primary responsibility for investigating the Fitzgerald bombing.  Neither Rico nor agents of the FBI played any role or otherwise assisted in that investigation.

92.  In September 1969, Rico telephoned Flemmi and informed him that "indictments were coming down" in the Fitzgerald

case and suggested that Flemmi and "his friend", Salemme "leave town" promptly.   Flemmi followed Rico's advice and he and Salemme fled together.

93.  A few days later, on September 11, 1969, Flemmi and Salemme were indicted in Middlesex County for the Fitzgerald bombing and in Suffolk County for the William Bennett murder.

94.  On September 15, 1969, Flemmi was closed administratively as an informant of the FBI and a federal fugitive warrant was issued for his arrest for his unlawful flight to avoid prosecution for murder.

95.  On September 15, 1969, Flemmi was closed administratively as an informant of the FBI and a federal fugitive warrant was issued for his arrest for his unlawful flight to avoid prosecution for murder.

### D.   Flemmi as a Fugitive

96.  While Flemmi was a fugitive from justice, allegedly being pursued by the FBI, Flemmi stayed in contact with Rico.

97.  FBI policy required that all contacts with informants be recorded.  Rico made no effort to record his September 1969 Conversation with Flemmi, nor any other conversation he had with Flemmi while Flemmi was a fugitive.  Rico also

failed to tell the agents responsible for Flemmi's apprehension that Rico had spoken to him.

98. Unlike Flemmi, Salemme was arrested and prosecuted for the Fitzgerald bombing. Salemme was convicted and, as a result, spent the next 15 years in prison.

99. Following the trial and conviction of Salemme, Flemmi called Rico at the Miami office of the FBI, where Rico was then working. Rico told Flemmi that he should return to Boston and his legal problems would be favorably resolved.

100. Rico assured Flemmi that when he returned to Boston, he would be released on bail and all charges against him would be dismissed.

101. As arranged by Rico, on May 6, 1974, Flemmi returned to Boston and met in Park Square with two Boston detectives. Despite the fact that for five years he had been a fugitive from charges of murder and attempted murder, Flemmi was promptly released on bail by the Middlesex and Suffolk Superior Courts. The federal flight charges were dismissed on the same day.

102. The Fitzgerald bombing charges against Flemmi were subsequently dismissed and on November 13, 1974 the Bennett murder charges concerning Flemmi were also dismissed. Flemmi was a free man.

30

### E.   FBI-Boston Develops Bulger as an Informant

103. In 1972, Morris was transferred to the Boston Office of the FBI and assigned to the Organized Crime squad.

104. In or about 1974, Connolly was transferred to the Boston Office of the FBI and also assigned to the Organized Crime squad.

105. Connolly had known Bulger since they were both children growing up in South Boston.

106. On September 30, 1975, Bulger became a source for Connolly and FBI-Boston administratively designated Bulger as an FBI informant.

107. Bulger explained to the FBI that he became an informant in part because he had "a close feeling towards John Connolly because they both grew up in the same neighborhood in Boston and had mutual childhood problems, as well as a deep hatred for La Cosa Nostra."

108. When Connolly sought Bulger's cooperation as an informant, the FBI knew that Bulger was deeply involved in violent gang war, was extorting money from bookmakers, and was widely regarded and known as being brutally violent.

109. On February 4, 1976, several months after being officially designated an informant, FBI-Boston upgraded Bulger to top Echelon Status.

### F.   The "Special Relationship:"  FBI-Boston and Bulger/Flemmi

110. At all times material to this Complaint, the "Winter Hill Gang" or the "Bulger Group" was a clandestine criminal enterprise that, in the course of more than two decades of operation, generated millions in illegal revenue.  The enterprise did so through a membership of gang associates, operatives and enforcers engaged, in turn, in crimes, including murder, bribery, extortion, loan sharking, and illegal gambling in the greater Boston area.  All of these crimes were subject to the jurisdictional authority of the FBI.

111. During relevant times in this Complaint, FBI-Boston was actively investigating the Boston branch of the LCN, commonly referred to as the "Mafia".  The Mafia was a nationwide clandestine criminal organization, whose crimes were subject to the jurisdictional authority of the FBI. The LCN was in direct criminal competition with the Winter Hill Gang.  In order to investigate the LCN, FBI-Boston sought out and enlisted informants, to provide intelligence and information about the LCN's criminal activities.

112. Bulger and Flemmi were signed on as FBI informants and agreed to cooperate with the FBI, to provide to its agents certain information concerning the criminal activities of

32

the LCN.   The FBI intended to prosecute and convict members of the LCN using the information provided to it by Bulger and Flemmi.

113. In or about September 1980, Connolly officially re-registered Stephen Flemmi as a confidential informant for the FBI.   At all times material to this Complaint, Connolly was the FBI agent contact ("handler") assigned to receive information from Bulger and Flemmi.

114. Special Agents of the FBI working out of the Boston office, including Rico, Greenleaf, Ring, Morris, Connolly, Fitzpatrick and Ahearn, knew that despite their informant status with the FBI, Bulger and Flemmi were still engaged in serious criminal wrongdoing throughout relevant times in this Complaint.

115. Agents of the FBI, including Morris and Connolly, made Bulger and Flemmi (who were previously acquainted, but not close friends), a perfect match.   In Boston, Flemmi and Bulger uniquely shared an antipathy for the LCN, and the desire to profit criminally from the LCN's destruction and from the promised protection of the FBI.   In order to protect Bulger and Flemmi as sources of information, agents of the FBI, including Connolly, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.   At all times relevant

33

to this case, agents of the FBI, in order to protect Bulger and Flemmi from prosecution, and to further their criminal activities, knowingly falsified official FBI documents regarding Bulger's and Flemmi's participation in criminal activities.

116. During times relevant to this case, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, agents of the FBI failed to report Bulger and Flemmi's ongoing criminal activities, including crimes of violence, extortion, loan sharking and illegal gambling.

117. During times relevant to this Complaint, agents of the FBI, in order to protect Bulger and Flemmi, failed to properly index information concerning the criminal activities of Bulger and Flemmi and place that information in the investigative files referencing their names.

118. At times material to this Complaint, agents of the FBI, including Connolly and Morris, tipped Bulger and Flemmi to the identity of individuals who were providing criminal information against Bulger and Flemmi.

119. As a direct and natural consequence of the disclosures of this sensitive law enforcement information, and as Connolly and Morris knew or had reason to believe would be the case, these individuals were murdered.

120. Agents of the FBI made insidious efforts to cultivate in Bulger and Flemmi the sense that Bulger and Flemmi were their friends, consultants, and allies, rather than serious, hardened criminals who also happened to be informants of criminal activity.

121. As the alliance between the FBI and Flemmi and Bulger developed, Flemmi and Bulger were invited to dine periodically with agents of the FBI engaged in investigating the LCN, including Connolly, Morris and Ring. These dinners were arranged to celebrate milestones in the FBI's relationship with Bulger and Flemmi, including the successful wiretapping of the LCN's Boston headquarters, as well as the frustration of an investigation of Bulger and Flemmi that had been conducted by the U.S. Drug Enforcement Agency (the "DEA") in 1984-85.  At these dinners, the agents, and Bulger and Flemmi exchanged gifts.

122. Following his retirement from the FBI in December 1990, Connolly maintained associations at the Boston field office of the FBI in order, in part, to obtain law enforcement information relative to the criminal activities of Bulger, Flemmi and others.

123. After leaving the FBI, Connolly used the information he gained from the FBI to alert and apprise Bulger and

Flemmi of law enforcement investigations into their criminal activities.

124. During hearings held in the matter of *United States of America v. Francis P. Salemme, et al* in the United States District Court for the District of Massachusetts, the FBI failed to timely produce to the defendants or the Court, as the Court had specifically ordered, Agency documents potentially damaging to the FBI and thus, the United States.

125. On August 21, 2001, while sentencing Flemmi in connection with *United States v. Stephen J. Flemmi*, CR. 94-10287, the District Court (Wolf, J.) stated:

> If Mr. Flemmi has committed any of the crimes with which he remains charged, he was able to do so largely because of the protection of the Federal Bureau of Investigation. It is clear to me that Mr. Flemmi would have either been killed or in prison, like Frank Salemme, if Paul Rico had not, in 1969, tipped him off and encouraged him to flee just before Mr. Flemmi was indicted for the bombing of John Fitzgerald and the murder of Walter Bennett.

> All of the murders with which Mr. Flemmi is charged in the pending cases against him occurred after he was told by Rico in 1974, to return to Boston and, as promised, the charges against him were dismissed. I note that the first of the alleged murders in the case before Judge Stearns occurred in October, 1974, just months after Mr. Flemmi returned.

> Transcript of Sentencing Hearing, *United States v. Stephen J. Flemmi*, Cr. 94-10287-MLW.

**G.  Protecting their Prized Informants, FBI-Boston Ignores and/or Negligently Fails to Acknowledge a String of Bulger/Flemmi Murders, All Pre-Dating the Bulger Group's Murder of Roger Wheeler.**

126. By the time Bulger/Flemmi dispatched Martorano to Florida, to rid themselves of John Callahan's potential cooperation in the investigation of the murder of Roger Wheeler, agents of the FBI, including Morris, Connolly and Fitzpatrick either knew or should known that Bulger and Flemmi had a penchant for, and a long history of, gruesome violence, including murder and attempted murder.

127. As previously alleged herein, in November 1965, Rico Targeted Flemmi for development as a top echelon informant. After Flemmi became an FBI informant Flemmi nonetheless engaged repeatedly in the threatened and actual use of violence, including assault, attempted murder and murder.

128. In or about January 1967 in the Commonwealth of Massachusetts, Flemmi and others murdered Edward "Wimpy" Bennett.

129. As alleged elsewhere in this Complaint, on February 8, 1967, FBI-Boston designated Flemmi a Top Echelon informant. After having been so designated, and notwithstanding his frequent contacts with FBI-Boston, Flemmi continued to be

repeatedly engaged in the threatened and actual use of violence, including assault, attempted murder and murder.

130. In or about April 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Walter Bennett.

131. On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered William Bennett.

132. On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Richard Grasso.

133. From September 1969 to May 1974, Flemmi fled Massachusetts and thus became a fugitive on charges of murder and attempted murder.  On May 6, 1974 and despite these charges, Rico arranged for Flemmi to return to Boston, free from fear of prosecution.  Shortly after Flemmi's return the long-pending charges against him were dismissed.  Flemmi then resumed his role as an informant providing information to the Boston office of the FBI.

134. On or about September 30, 1975, Bulger became a source for Connolly; FBI-Boston thus administratively designated Bulger to be an FBI informant.

135. On or about March 8, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered Michael Milano.

136. On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others, shot Dianne Sussman.

137. On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others shot Louis Lapiana.

138. On or about March 19, 1973 in the Commonwealth of Massachusetts Bulger and others murdered Al Plummer.

139. On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others, shot Hugh Shields.

140. On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others, shot Frank Capizzi.

141. On or about March 24, 1973 in the Commonwealth of Massachusetts Bulger and others murdered William O'Brien

142. On or about March 24, 1973 members and associates of the Bulger Group including Bulger and others, shot Ralph DiMasi.

143. On or about April 3, 1973 members and associates of the Bulger Group including Bulger and others, murdered James Leary.

144. On or about April 18, 1973 members and associates of the Bulger Group including Bulger and others, murdered Joseph Notorangeli.

145. On or about December 1, 1973, in the vicinity of Dorchester, Massachusetts, Bulger and others murdered James O'Toole.

146. On or about February 21, 1974 members and associates of the Bulger Group including Bulger and others, murdered Al Notorangeli.

147. In or about October 1974, in the vicinity of Somerville, Massachusetts, Bulger, Flemmi and others murdered James Sousa, a criminal associate who had been involved in a botched robbery with other members and associates of the Bulger Group.  Bulger and Flemmi had Sousa shot and killed after Sousa had been arrested and charged in connection with that robbery because Bulger and Flemmi considered him to be a potential witness against members of the Bulger Group.

148. In or about November 1974, in the vicinity of South Boston, Massachusetts, Bulger and others murdered Paul McGonagle.

149. On or about June 12, 1975, in the vicinity of Dorchester, Massachusetts, Bulger, Flemmi and other murdered Edward Connors.

150. On or about November 5, 1975, in the Vicinity of South Boston, Massachusetts, Bulger and Flemmi and others murdered Thomas King.

151. On or about November 6, 1975, in the vicinity of South Boston, Massachusetts, Bulger and others murdered Francis "Buddy" Leonard.

152. In or about December 1976, Connolly tipped certain confidential law enforcement information to members and associates of the Bulger Group, that is, that Richard Castucci was providing information to agents of the FBI regarding the whereabouts of fugitives Joseph M. McDonald and James L. Sims.

153. On or about December 30, 1976, in the vicinity of Somerville, Massachusetts, Bulger and Flemmi and others murdered Richard Castucci.

154. On or about April 4, 1980, Bulger and others murdered Louis Latif.

155. On August 2, 1982, at the direction of Bulger and Flemmi, John V. Martorano and Joseph MacDonald murdered John B. Callahan in Miami, Florida.

### H. FBI-Boston Forges the Bulger/Flemmi Criminal partnership

156. As U.S. District Judge Wolf specifically found in *U.S. v. Salemme, et als* (91 F.Supp.2d at 198), the FBI made

repeated efforts to cultivate in Bulger and Flemmi the sense that Bulger and Flemmi were their friends, consultants, and allies, rather than serious, hardened criminals who were also informants of criminal activity.

157. In early 1975, Bulger asked Flemmi whether he would be willing to meet with Connolly.  Soon after, Flemmi met with Connolly and Special Agent Condon at a coffee shop in Newton, Massachusetts.

158. Following the Newton meeting with Connolly and Condon, Flemmi began passing information about the LCN to Connolly, through Bulger.

159. Connolly understood that Bulger and Flemmi were dangerous, with serious propensities to crimes of violence, including murder, and criminal histories to match.  As Connolly has explained:  "[W]e knew what these guys were. They did not have a paper route when we first met them. All of them, top echelon informants, are murderers.  The government put me in business with murderers."

160. Connolly routinely protected himself, Flemmi, Bulger, and the reputation of the FBI by furnishing Bulger and Flemmi information that might help them avoid arrest and prosecution.

161. From approximately 1976 through 1994, Connolly, and Morris received gifts from both Flemmi and Bulger.

162. From approximately 1976 through 1994, Connolly provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and at times, their criminal associates.

163. From at least 1976 through December 1990, Connolly, while he served as a special agent of the FBI, using confidential information that he had received from Morris and from other FBI and law enforcement sources, ripped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

164. From at least 1976 through December 1990, Connolly, while he served as a special agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

165. As the alliance between the FBI and Flemmi and Bulger developed, Flemmi and Bulger were invited periodically, to dine with agents of the FBI engaged in investigating the LCN, including Connolly and Morris.  These dinners were arranged to celebrate milestones in the FBI's relationship with Bulger and Flemmi, including the successful (1980)

wiretapping of the LCN's (Prince Street) Boston
headquarters.  At these dinners, the agents on the one
hand, and Bulger and Flemmi on the other, exchanged gifts.

166. From at least 1976 until his retirement from the FBI
in December 1990, in order to protect Bulger and Flemmi
from prosecution and to further their criminal activities,
Connolly, in knowing and willful violation of his
responsibilities as an FBI agent, endeavored to preserve
Bulger's and Flemmi's status as confidential informants by
failing to report information relating to Bulger and Flemmi
which was material to the investigation of criminal
activity in the Boston area.

167. Supervisory Special Agents of FBI-Boston failed to
provide seminars or major training for the benefit of line
Agents concerning reach and application of the Guidelines.
Morris did not read the new informant Guidelines when they
were issued.  The Guidelines were discussed occasionally in
more general training sessions, but the FBI-Boston
Organized Crime supervisors did not get answers to any
questions that they had; Line agents of FBI-Boston were not
properly trained in the Guidelines, generally.

168. In violation of the Guidelines, Morris and Ring viewed
the Guidelines as inconsistent with the Top Echelon
informant program.  Thus, in violation of the mandates of

the Guidelines, Morris and Ring decided that the Guidelines did not and would not apply to Organized Crime matters despite their knowledge of the long history of serious acts of violence committed by Bulger and Flemmi, whom they also knew to be FBI informants.

169. Morris and Ring ignored and violated the provisions of the Attorney General Guidelines that required authorization of criminal activity and reporting of unauthorized crime committed by informants.

170. Greenleaf failed to enforce or apply the Guidelines to the Organized Crime Squad despite an apparent history of violence committed by Bulger and Flemmi whom Greenleaf knew to be confidential informants.

171. FBI headquarters in Washington, D.C. failed to effectively supervise the implementation of the Guidelines. While FBI headquarters periodically audited the Boston office's informant files, no deficiencies with regard to the handling of Bulger or Flemmi were noted, despite the fact that those files were replete with information indicating that Bulger and Flemmi had been and were involved in serious criminal activity that had not been authorized in writing, had not been investigated by the FBI, had not been reported to other law enforcement agencies, and had not been reported to the Assistant

Attorney General for the Criminal Division as required by the Guidelines.  While representatives of FBI headquarters engaged in this audit, these representatives uncovered no information or deficiencies that suggested that Bulger or Flemmi were involved with the murders of Castucci, Halloran Callahan or McIntyre.

172. With regard to FBI-Boston's Top Echelon informants (Bulger and Flemmi), Greenleaf, Ring, Morris, Connolly, Fitzpatrick and Ahearn disregarded the carefully calibrated standards and procedures that had been developed by Attorney General Levi and his successors.

173. While SAC, Greenleaf had delegated the responsibility for recommending the opening and closing of informants to the agent who was the informant's handler.  The handler, acting in concern with his supervisor, was also given responsibility for any review of the informant's status.

174. While SAC, Greenleaf knew that Bulger was an FBI informant.  Greenleaf also knew that although Flemmi may have been technically closed as an informant, he was nonetheless regularly providing information to the FBI.

175. Greenleaf was also aware that Connolly was the handler for both Bulger and Flemmi.  Greenleaf generally relied on Connolly and his supervisor, James Ring, to deal with Bulger and Flemmi, and with any matters relating to them.

176. As set forth above, during this relevant time, the
Attorney General's guidelines, which had been incorporated
in the FBI's Manual, required that the SAC himself make
certain decisions, after consultation with the United
States Attorney, whether to authorize extraordinary
criminal activity involving a "serious risk of violence,"
and review all such criminal activity, at least every 90
days.

177. Greenleaf violated this duty; rather than undertake
these duties and responsibilities himself, Greenleaf
improperly delegated these responsibilities to Connolly and
Morris.

178. The Attorney General's Guidelines, which were
incorporated in the FBI Manual, required a special review
process if an FBI field office wanted to keep an informant
open after it learned that he had participated in a serious
act of violence or any other serious crime.

179. When Ring became head of the Organized Crime Squad,
Morris suggested that Ring terminate Bulger and Flemmi as
sources because they "had outlived their usefulness."

180. Ring did not seek to have Bulger closed as an
informant.  Rather, on February 23, 1983, he approved a
memorandum captioned as coming from Greenleaf, prepared by
Connelly, to FBI Headquarters recommending that Bulger be

elevated to Top Echelon informant status.  The memorandum characterized Bulger as "one of the most highly placed and valuable informants in the Boston Division."

181. On May 26, 1983, Connolly wrote a memorandum to Ring requesting a determination of whether Flemmi would imminently be indicted as a result of the Wheeler-Callahan murder investigations or in the case arising from electronic surveillance at 98 Prince Street. Connolly based his request on the fact that Flemmi "continues to voluntarily furnish sensitive information of an extremely high quality."

182. During Ring and Connolly's tenure at the FBI, Flemmi was never indicted for his role in the Wheeler or Callahan murders or for the case arising from electronic surveillance at 98 Prince Street.

183. By the fall of 1983, Ring had met Bulger and Flemmi twice.  The first time Ring went with Connolly to Bulger's apartment.  The second meeting involved a dinner that Connolly arranged at Flemmi's parents' home.

184. Ring used these occasions, in part, to observe and evaluate Connolly's interaction with Bulger and Flemmi. Ring did not like what he saw.  Instead, Ring believed that Connolly was treating Bulger and Flemmi like "friends" or "consultants" rather than as informants.

185. For example, Connolly was giving Bulger and Flemmi information and asked Ring to do the same.

186. Despite his concerns - expressed Connolly - about the manner in which Connolly was treating Bulger and Flemmi, Ring did not discipline Connolly or alter Connolly's responsibilities concerning Bulger and Flemmi. Furthermore, contravening Ring's usual practice and in violation of the FBI Manual, no Form 209 exists relating to the meeting Ring attended at Flemmi's parents' home, nor is there any record of Ring's admonitions to Connolly in this regard.

187. In 1983 and 1984, Ring knew that Bulger and Flemmi were engaged in "a whole host of criminal activities." Indeed, Ring expected them to be involved in criminal activities.

188. Ring did not provide FBI Headquarters updated information on Bulger and Flemmi's criminal activities.

189. Ring believed that the Attorney General Guidelines' process for providing authorization to an informant to commit crimes was not feasible for Organized Crime informants.  Morris told Ring that seeking authorization for criminal activity of Organized Crime informants was not "worth the aggravation."  Ring agreed and the Guidelines

were ignored by Greenleaf, Ring and their subordinates including Morris and Connolly.

190. When members of the FBI received reliable information about criminal activity in which Bulger and Flemmi were engaged, they regularly consulted Connolly and then did not pursue any investigation.

191. Assistant United States Attorney James Herbert and the United States Attorney Donald Stern admitted the Attorney General's Informant Guidelines were not obeyed, at least with regard to Flemmi.  As Assistant United States Attorney James Herbert stated:

We don't dispute…the Court's conclusion that the theory behind the Guidelines and the FBI's policies and procedures was to remove from the line agent the responsibility and the authority to make difficult decisions with respect to criminal informants…that is what they were designed to do and I don't think they were followed in connection with Mr. Bulger and Mr. Flemmi in the manner they were designed to.

United States Attorney Donald Stern likewise stated:

The FBI and attorney general informant guidelines, together with FBI administrative controls, are intended to provide the necessary checks and balances and to ensure that often difficult decisions are made to the appropriate level, based on complete and accurate information.  While admittedly no system is foolproof, clearly those objectives were not met here, at least in certain critical respects.

192. As alleged above, in the years prior to the Callahan murder, Bulger and Flemmi, separately and jointly, committed nearly two dozen murders and countless other

violent criminal acts, all in the Greater Boston area, and thus under the nose of FBI-Boston. In the Agency's dogged institutional pursuit of LCN-Boston, however, this wave of violence generated little or no interest within FBI-Boston. The net effect of the FBI's efforts, from the perspective of the Winter Hill Gang and as FBI-Boston well knew, was to embolden the Gang and its members, to commit criminal acts, including acts of violence, with a sense of impunity. They would not be investigated; they would not be prosecuted. Indeed, they would be rewarded with confidential law enforcement information, such as how to avoid investigative measures targeting them, and the identities of those seeking to cooperate with law enforcement against them.

193. Amongst its wrongful actions and omissions, the Federal Defendants also affirmatively misrepresented and otherwise purposely concealed from Plaintiffs over the years, those (wrongful and thus non-privileged) facts and circumstances underlying and surrounding the foregoing illicit ("special") relationship between FBI-Boston and Bulger/Flemmi. The facts and circumstances so concealed, and only more recently wrested from the FBI, form the bases of the instant claims for legal damages and equitable relief.

194. The extraordinary lengths to which the FBI would go to protect its "Top Echelon" informants, and the corresponding growing sense of impunity enjoyed by the Winter Hill Gang, are illustrated and borne out by the following:

    **I.   The Murder of Richard Castucci:  A History of Removing the Threat**

195. On or about July 31, 1975, Joseph McDonald and James Sims, both members of the Winter Hill Gang, were charged with crimes in a federal indictment in the District of Massachusetts.  McDonald and Sims became fugitives from those charges.

196. In 1976, Richard Castucci was a nightclub owner and bookmaker who associated with the Winter Hill Gang.  At the behest of the Winter Hill Gang, Castucci subsequently assisted McDonald and Sims in obtaining an apartment in the Greenwich Village section of New York City while they remained fugitives.

197. During that time, Castucci also was a confidential informant of the FBI.  In the later part of 1976, Castucci began to provide the FBI with specific information regarding the whereabouts of McDonald and Sims.

198. In late 1976, Connolly provided otherwise confidential law enforcement information to Bulger, which alerted him to

the fact that Castucci was a confidential informant of the FBI.

199. On or about December 29, 1976, as a result of being informed of Castucci's relationship with the FBI, members of the Winter Hill Gang, including Bulger and Flemmi, murdered Richard Castucci.

### J.   The Race-Fix Case:  FBI-Boston Protects Bulger/Flemmi

200. On January 27, 1978, Bulger was closed administratively as an informant because he was a primary subject of an investigation that focused on the payment of bribes to fix horse races.  An informant is closed once he becomes a primary subject of a criminal investigation.

201. Bulger and Connolly discussed the prospect that Bulger and Flemmi would be indicted in the race-fix case.  Neither the FBI, nor Bulger nor Flemmi wanted them to be charged. Bulger and Flemmi did not want to be charged because they did not wish to go to jail and lose their liberty.  The FBI did not want Flemmi and Bulger to be charged because it would lose Flemmi and Bulger's services as informants.

202. The United States Attorney's Office for the District Massachusetts was preparing indictments for the race-fix case.

203. Morris and Connolly asked the prosecutor not to indict Bulger and Flemmi in the race-fix case. Morris and Connolly were successful, and Bulger and Flemmi were not included in the indictment.

204. A RICO indictment relating to the race-fix scheme was returned against 13 defendants and after a 46 day trial, all of the defendants who had not pled guilty or fled were convicted.

205. In May 1979, the FBI in Boston requested and received from the Director of the FBI, approval to reopen Bulger as an informant. When reopening Bulger, the FBI informed the Director that "no prosecutable case developed against [Bulger] in the opinion of the Strike Force Attorney handling the matter." This statement was false. Bulger and Flemmi were not prosecuted in the race-fix case because Connolly and Morris had persuaded federal prosecutors that their value as informants outweighed the importance of prosecuting them.

206. At the time the FBI officially reopened Bulger as an informant, Connolly and Morris were well aware that Bulger and Flemmi remained involved in a range of criminal activity. Nevertheless, the FBI neither investigated nor disclosed such information to any other law enforcement agency.

207. In July 1979, Morris received reports from informants that Bulger and Flemmi were "shaking down" independent bookmakers.  The FBI made no effort to investigate this matter.

208. In 1979 and early 1980, the FBI received information from informants that Bulger and Flemmi were involved in other criminal activity, including illegal gambling and trafficking in cocaine.  These allegations were not investigated.

**K.    The Lancaster Street Garage Investigation:  FBI-Boston Confirms A Tip to Bulger**

209. In 1980, the FBI, through its agents, as set forth below, contributed to frustrating a Massachusetts State Police investigation of criminal activity of Bulger, Flemmi and others occurring at the Lancaster Street Garage.

210. The Massachusetts State Police had determined that "virtually every organized crime figure in the metropolitan area of Boston, including both LCN and non-LCN (Winter Hill) organized crime figures frequented the premises" at the Lancaster Street Garage.  Flemmi and Bulger were among those targeted by the Massachusetts State Police.

211. The Massachusetts State Police were concerned that the FBI not be told about the investigation and proposed electronic surveillance because it believed that Flemmi and

Bulger were informants, working with Morris, who might compromise the investigation if he knew about it.

212. Without the direct participation of the FBI, the Massachusetts State Police installed a microphone in the Lancaster Street Garage on or about July 24, 1980. For approximately two weeks, the investigation was "extremely productive."  However, it then became apparent to the Massachusetts State Police that the targets of the investigation had been tipped off concerning the electronic surveillance.

213. Flemmi initially received information about the State Police's electronic surveillance from a Massachusetts State Police Trooper.  Connolly confirmed for Bulger and Flemmi that the Lancaster Street Garage was bugged by law enforcement.  Flemmi and Bulger advised some of their associates of the bugging operation.  The discussion of criminal activity at the Lancaster Street Garage ceased.

**L.   The 98 Prince Street Investigation.  Bulger and Flemmi Use FBI-Boston to Rid Themselves of Their "Competitors."**

214. In October 1980, Morris and Connolly gave Bulger and Flemmi the assignment to provide information that would allow for the bugging of the LCN headquarters.

215. On January 9, 1981, the government applied for and received a warrant to bug 98 Prince Street, the headquarters of the LCN.

216. Bulger and Flemmi, in violation of FBI rules and regulations, were told when the bug had been installed in January 1981 and when it was removed in April.

217. In January 1981, Flemmi, Bulger, Connolly and Morris gathered in Morris' home in Lexington, Massachusetts for a belated Christmas celebration.  Bulger and Flemmi brought wine and a champagne bucket for Morris.  Morris reciprocated by giving Flemmi, a Korean war veteran, a painting from Korea.

218. On November 25, 1980, Special Agent Lawrence Sarhart met with Bulger as part of his efforts to determine whether the FBI had compromised the Massachusetts State Police Lancaster Street Garage investigation and whether Bulger and Flemmi should be continued as informants.  At this meeting, Bulger falsely claimed that he had not been given any information about the Lancaster Street Garage investigation by the FBI.  In providing this false information, Bulger was protecting Connolly.

219. In or about March 1981, defendant Fitzpatrick met with Bulger to re-evaluate whether he should continue as an informant.  Fitzpatrick had concerns that Bulger and Flemmi

were engaged in serious criminal conduct, including crimes of violence in collecting "tribute" from drug traffickers. There is no written record indicating that Fitzpatrick ever expressed such concerns to his supervisor.

220. Fitzpatrick reviewed and initialed a memorandum prepared by Connolly and Morris seeking to continue Bulger and Flemmi as informants without dissent.

221. In or about April or May 1981, Morris met with Bulger and Flemmi at the Hotel Colonade, at which time the three drank wine, with Morris drinking so much that Bulger had to drive him home.

222. In the fall of 1983, Connolly and Morris had dinner with Bulger and Flemmi at Flemmi's parent's home in South Boston.  This meeting was a celebration of the government's return of indictments against members of the LCN.

**M. The Bulger Group Murders Callahan**

223. In the Summer of 1982, John Martarano learned from Flemmi that the FBI would be putting pressure on John Callahan to assist tin the investigation of the Wheeler murder.  It was agreed that Callahan would be killed.

224. At that time, the Bulger group were getting a lot of heat relative to the murder of Brian Halloran.  As such, the Bulger group decided that they would kill Callahan in Florida and make the murder appear to be robbery related.

226. In September of 1999, Judge Wolfe concluded in United States v. Salemme that the murder of John Callahan remained unsolved.

227. In March of 2001, pursuant to a plea agreement, John Martarano pleaded guilty to murdering John Callahan in August of 1982.

**N.   To Protect the FBI (and Themselves) From the Adverse Consequences of Exposure of Its "Special Relationship," FBI-Boston Engages in a "Conspiracy of Silence."**

228. The FBI in Oklahoma City needed to explore Callahan's relationship with Halloran, as part of its investigation of Bulger and Flemmi.  The FBI's Boston organized crime squad opened an investigation to support Oklahoma City's effort to solve the Wheeler murder.

229. In 1981, at Morris' request, Connolly interviewed Callahan as part of the investigation.  The Boston investigation was then quickly closed.

230. In January 1982, Halloran, who was facing a state murder charge, began to cooperate with the FBI in Boston. Among other things, Halloran told Special Agents Leo Brunnick and Gerald Montanari, two members of the Boston's FBI's Labor and Racketeering Squad, that he met Bulger and Flemmi at Callahan's apartment and was asked if he was willing to murder Wheeler.  Halloran told Brunnick and Montanari that Bulger and Flemmi along with John Callahan

and John Martorano had caused Wheeler to be murdered.
Brunnick consulted Morris, as the supervisor of the
organized crime squad to get his assessment of Halloran's
reliability as a potential witness.  Brunnick told Morris
about Halloran's allegations concerning Bulger and Flemmi.
Morris realized that Halloran's allegations threatened
their future as FBI informants, among other things, because
it was FBI policy to close sources that it was
investigating.

231. Morris and Connolly did not want to lose, as
informants, Flemmi and Bulger, who were important to their
investigations and to their own status and future careers
in the FBI.  Morris told Brunnick that Halloran was
untrustworthy and unstable and would not be a believable
witness.

232. The FBI in Oklahoma City expressed an interest in
interviewing Halloran regarding the Wheeler murder.  The
FBI agents in Boston failed to inform the Oklahoma City
agents of Halloran's allegations against Flemmi and Bulger.

233. Halloran knew that his willingness to cooperate with
the FBI, if disclosed, would place his life in danger.  He
therefore requested to be in the witness protection
program.

234. Morris told Connolly that Halloran was speaking with other agents and providing information about Bulger and Flemmi.  Morris told Connolly that Halloran had implicated Bulger and Flemmi in the Wheeler homicide.

235. In or about May 1982, Connolly told Bulger and Flemmi that Brian Halloran was providing  information to agents of the Federal Bureau of Investigation regarding, among other things, the involvement of Bulger, Flemmi and Martorano in the Tulsa, Oklahoma murder of Roger Wheeler.  Bulger Group members and associates also learned that Brian Halloran was providing information to agents of the Federal Bureau of Investigation regarding the involvement of Bulger and others in the 1980 murder of Louis Latif.

236. In early May 1982, the FBI denied Halloran's request to be placed in the witness protection program and told Halloran that his relationship with the FBI was terminated.

237. On or about May 11, 1982, in the vicinity of Northern Avenue, South Boston, Massachusetts, Bulger, Kevin Weeks and others murdered Brian Halloran and Michael Donahue; Donahue was a mere bystander, having only accepted Halloran's offer of a ride in an automobile with Halloran at the time Halloran was murdered.

238. Bulger, and others under Bulger's direction and control, murdered Halloran to prevent Halloran's further

cooperation with law enforcement authorities and to prevent his testimony before a federal grand jury investigating the murder of Roger Wheeler.

239. Morris believed that Bulger and Flemmi were responsible for Halloran's murder, yet failed to undertake any steps to investigate Halloran's death.  The next time that Morris asked Connolly to tip Flemmi off to an investigation, he added that he "did not want another Halloran" – meaning, another murder.

240. Following Halloran's murder, the FBI met with Halloran's wife, gave her $1,000 and left.  From that time and date until 2000, Mrs. Halloran heard nothing from the FBI concerning the investigation of her husband's murder.

241. Morris knew that Connolly's tipping Bulger and Flemmi about Halloran's effort to cooperate with the FBI would be relevant to any investigation of Halloran's murder, but he never provided this information to anyone in the FBI. Morris also did not tell the Suffolk County District Attorney's Office, which, as Morris knew, conducted an investigation in this matter.

242. Morris, Connolly and others at FBI-Boston failed to comply with the Attorney General guidelines concerning the disclosure of information regarding Bulger and Flemmi's

possible involvement with Halloran's murder to local law enforcement authorities in Boston or Oklahoma.

243. The Halloran murder presented a dilemma for the FBI. It precipitated a May 25, 1982 meeting at FBI Headquarters to grapple with Bulger and Flemmi's dual status as valuable FBI informants and also suspects in the investigations of the Wheeler and Halloran murders.  Representatives of the FBI offices in Boston, Oklahoma City, and Miami met with FBI Headquarters officials, including Sean McWeeney, Chief of the Organized Crime Section, and Jeff Jamor, the Informant Coordinator.

244. As a result of this meeting, a decision was made to keep Bulger and Flemmi open as sources unless and until "substantiated information" implicating them in the murders was received.

245. In or about June 1982, Connolly told Bulger and Flemmi that investigative efforts relating to the murder of Roger Wheeler were being directed toward John B. Callahan, former president of World Jai Alai.

246. Concerned that Callahan might implicate Bulger and Flemmi in the Wheeler murder, and to prevent his cooperating with law enforcement authorities and providing testimony in the Wheeler homicide investigation, Bulger and

Flemmi combined and agreed with Martorano that Martorano
should travel to Florida to murder Callahan.

247. On or about August 1, 1982, Callahan was murdered;
some days later, Callahan's body was discovered in the
trunk of an automobile, in the long-term parking lot of the
Miami International Airport.

248. On September 23, 1982, Flemmi was administratively
closed as an informant.  Connolly and Morris told FBI
Headquarters that they were closing Flemmi because he was
being targeted for possible prosecution in other
investigations.  This statement was a lie.

249. In April 1983, the FBI in Oklahoma City sought
authority from the Director of the FBI to interview Bulger
and Flemmi.  Defendant Fitzpatrick strongly and
successfully opposed this request.  In doing so,
Fitzpatrick claimed that he had interviewed Bulger
concerning the Wheeler and Callahan murders, and that
Bulger had denied being involved.

250. This was a lie:  Fitzpatrick never questioned Bulger
on these subjects.

251. Fitzpatrick did not trust Connolly fully, but also
argued that Oklahoma City should not be allowed to
interview Bulger and Flemmi in part because Connolly was in
continual contact with them and was disseminating all

relevant information that he received regarding the Wheeler
and Callahan murders.  Fitzpatrick and others in the Boston
Office of the FBI were determined to control the
information, and therefore the decisions to be made
concerning Bulger and Flemmi.

252. Fitzpatrick knew or should have known that Connolly
was in violation of the Attorney General Guidelines
regarding Bulger and Flemmi, and, on information and
belief, he made no effort to verify that Connolly was
properly disseminating the relevant and necessary
information regarding the Callahan-Wheeler murders, after
preventing Oklahoma authorities from interviewing Bulger
and Flemmi.

253. Although Fitzpatrick and others were successful in
preventing the interview of Bulger and Flemmi by agents
outside of Boston, Bulger and Flemmi were interviewed
together by Montanari and Agent Brendan Cleary.

254. It is highly unusual for two subjects of an
investigation to be interviewed together.  Bulger and
Flemmi, not surprisingly, denied any involvement in the
Wheeler and Callahan murders.  Bulger and Flemmi refused to
take a polygraph examination and objected to being
photographed.  No photographs of Bulger and Flemmi from

this interview were produced in discovery or introduced as evidence in the *Salemme* matter.

255. In early 1988, Joseph Murray, who was then in federal prison, alleged, among other things, that Bulger and Pat Nee had murdered Halloran and Bucky Barrett. Murray stated that there was an eyewitness to the Halloran shooting who might come forward, and elaborated that "There is a person named John, who claims he talked to Whitey and Nee as they sat in the car waiting for Halloran on Northern Avenue. He sits in a bar and talks about it. He saw the whole operation." Murray added that the person providing the information to him "will be willing to talk to you (authorities) soon."

256. Murray also alleged that Connolly and Special Agent John Newton were selling information to Bulger and Flemmi concerning electronic surveillance.

257. Murray's information was provided to William Weld, who was then Assistant Attorney General for the Criminal Division, for the Department of Justice in Washington, D.C. On February 3, 1988, Weld directed that the information be forwarded to the United States Attorney in Boston and to the Chief of its Strike Force.

258. The FBI assumed responsibility for investigating Murray's charges.

259. In June 1989, AASAC Dennis O'Callahan assigned FBI
Agent Edward Clark, the Supervisor of the Bank Robbery
Squad, to interview Murray.  Also assigned was Edward
Quinn, a member of the organized crime squad who had then
worked with Connolly for 13 years and characterized
Connolly as a "close friend."

260. Clark and Quinn spoke to Murray at the Strike Force's
office in the Federal Courthouse in Boston on June 14 1989
– more than a year and a half after the initial call to
Weld.

261. The Clark interview notes make no reference that
Murray was asked questions concerning his allegations
regarding Connolly and Newton's sale of  information to
Bulger and Flemmi.  Either Murray was not asked about his
allegations concerning Connolly and Newton or the
information that he provided concerning them was not
recorded.  Similarly, although Murray reiterated that
Bulger and Nee had murdered Halloran, neither Clark nor
Quinn asked him about the individual named "John" who
Murray as previously asserted witnessed the killing.

262. Although Murray provided information linking Bulger
and Flemmi to the Halloran and Barrett murders, Clark was
not asked to engage in any further investigation and two
months later ASAC O'Callahan prepared a memorandum that was

forwarded to the Director of the FBI reporting that Murray
had been interviewed and the "[t]he allegations that SA
Connolly and SA Newton are disclosing information regarding
investigations being conducted by this division to criminal
elements are unsubstantiated by specific facts…."  The
administrative inquiry was then terminated in Boston and,
it appears, none of the FBI Headquarters, the United States
Attorney's Office, the Strike Force or the Department of
Justice pursued the matter.

263. Furthermore, the information that Murray provided
implicating Bulger and Flemmi in the Halloran and Barrett
matters was not provided to any agents responsible for
investigating those matters or indexed so that it could be
accessed by such agents, all in violation of FBI guidelines
and rules.

264. Similarly, although Clark felt Murray would make a
"terrific" informant, there is no evidence that any effort
was made by the FBI agents in Boston to utilize him as a
source despite his demonstrated willingness to provide
information.  Murray was effectively eliminated as a threat
to the relationship between the FBI and Bulger and Flemmi.

### O. Improper Indexing of Information Regarding the Murders of Wheeler, Halloran and Callahan.

265. The FBI in Boston violated Bureau rules and
regulations by rendering the information it had received
from Halloran regarding Bulger and Flemmi virtually
inaccessible to others who might wish to review or evaluate
it.

266. More specifically, in 1982 and 1983, FBI reports
containing allegations against an individual were to be
indexed by that individual's name and placed in the
investigative file.  With one exception, the many reports
containing Halloran's charges against Bulger and Flemmi
were not properly indexed with the reference to their
names.  Thus, during a Department of Justice investigation
in July of 1997, these documents were not found or
considered.

267. When a federal judge ordered that the government look
for the documents, FBI-Boston found them.  Nevertheless,
these documents were not promptly produced to the court,
thus preventing the examination of Rico and Morris
concerning their contents.

268. As a result of the delayed disclosure of the Halloran
documents and of the failure of the adversary system to
operate fully and effectively on this issue, the FBI
thwarted the efforts of the Federal District Court to
determine what roles, if any were played by Flemmi and

Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which FBI-Boston, from 1981 until at least September 15, 1999, attempted to keep any such role from being discerned an brought forward.

269. In July 2000, the United States finally brought charges against individuals involved in Halloran's murder. In July 2000, defendant Weeks pleaded guilty, in part, to aiding and abetting in Halloran's murder.  In September 2000, Bulger and Flemmi were indicted by a federal grand jury, in part, for Bulger's involvement in the murders of Wheeler, Halloran and Callahan and Flemmi's involvement in the murders of Wheeler and Halloran.  In October 2000, a Superseding Indictment was brought against Connolly, in part, for providing confidential law enforcement information to Bulger and Flemmi which alerted them to the fact that Halloran had provided information about the murder of Wheeler and that Callahan was sought as a witness in the Wheeler investigation in order to prevent Halloran's and Callahan's further cooperation and testimony.

**P.    The South Boston Liquor Mart:  The Bulger Group Continues Its Criminal Activities Under the Umbrella of FBI-Boston.**

270. In or about January 1984, Connolly received reliable information concerning an ongoing extortion by Bulger and Flemmi of Stephen and Julie Rakes.

271. Bulger and Flemmi decided that the South Boston Liquor Mart, which the Rakes had recently purchased, would be an excellent site for their criminal activities.  They, and Kevin Weeks, visited the Rakes and said they wanted to buy the liquor store.  The Rakes told them it was not for sale. Flemmi responded by pulling out a gun, commenting on how lovely the Rakes' young child was and reiterating that they were going to buy the liquor store.

272. Joseph Lundbohm was a Boston police detective and uncle of Julie Rakes.  The Rakes sought Lundbohm's assistance, telling him what occurred.  Lundbohm knew that Bulger and Flemmi were reputed to be dangerous members of the organized crime and sought the assistance of the FBI. Lundbohm contacted Connolly.  Connolly falsely told Lundbohm that unless Rakes agreed to wear a recording device in conversations with Bulger and Flemmi, the FBI was unlikely to take action on the Rakes' complaint.

273. In violation of FBI regulations, Connolly made no record of the information that Lundbohm had provided him, nor did he disclose it to defendant Ring, who had become the acting supervisor of the Organized Crime Squad in 1983.

274. Connolly did, however, tell Bulger of his conversation with Lundbohm.  As a consequence, Bulger urged the Rakes "to back off."

275. The agents in the Boston office failed to investigate
the extortion of the Rakes, Connolly failed to attempt to
obtain the testimony of Mr. And Mrs. Rakes.

276. The extortion scheme succeeded.  The Rakes reluctantly
sold their liquor store to Flemmi.

**Q.  The 1984-85 DEA "Bug:"  Another Tip to Bulger and
Flemmi**

277. In 1984 and 1985, the DEA and the FBI were authorized
by a series of court orders to engage jointly in electronic
surveillance targeting Bulger and Flemmi.

278. Armed with information provided by his colleagues,
Connolly contributed to assuring that DEA's efforts would
not succeed by alerting Bulger and Flemmi to the
investigation generally and to the electronic surveillance
particularly.

279. The FBI, determined not to confirm for the United
States Attorney or the DEA the accuracy of their
understanding that Bulger and Flemmi were FBI informants,
disregarded the government's legal obligation of candor to
the court when applying for authority to conduct electronic
surveillance.

280. McSweeney, the Chief for the Organized Crime Section
at FBI headquarters in Boston, told Connolly that the DEA

was trying to obtain a wire tap targeting Bulger and Flemmi.

281. Morris also told Connolly about the investigation targeting Bulger and Flemmi.

282. Connolly told Bulger and Flemmi that the DEA investigation had been initiated and advised them of the information he had obtained concerning its progress.  As a result, Bulger found the electronic bug in his car.

283. In the spring of 1984, Morris received from Bulger and Flemmi a second $1,000 payment and a case of wine.  These payments were the expression of Bulger's and Flemmi's appreciation for Morris's assistance in informing them of the DEA investigation against them.

284. When applying for court ordered wiretaps, the FBI made material omissions caused by its reckless disregard for the truth and for the obligations imposed by Title III and the United States Constitution, in order to protect Bulger and Flemmi.

285. Connolly provided to Flemmi the tip that the wiretap was placed on the telephone of George Kaufman.  In late 1984 or early 1985, Connolly began meeting with Bulger and Flemmi at Newton's apartment, rather than at Bulger's home or his own, because Connolly needed a new, secure location.

73

**R. The Murder of John L. McIntyre:  Since Becoming FBI Informants, The Twenty-Fourth Known Murder Laid at the Feet of Bulger/Flemmi.**

286. Halloran was not the only informant that the FBI identified for Bulger and Flemmi.  Rico disclosed the identity of several informants to Flemmi, and Connolly identified for Bulger and Flemmi at least a dozen individuals who were either FBI informants or sources for other law enforcement agencies.

287. In mid-October 1984, John L.. McIntyre, age 32, began cooperating with Richard Bergeron of the Quincy Police Department.  McIntyre reported that he was engaged in certain criminal activity and revealed that he was the engineer on a ship named the Valhalla, which had been used in an attempt to deliver guns and ammunition from Massachusetts to the Irish Republican Army in Ireland.

288. McIntyre stated to Bergeron that Joseph Murray was closely connected to Bulger and that Bulger, through his associates Kevin Weeks and Patrick Nee, was also involved in the Valhalla arms shipment.  Flemmi was also mentioned during the interview.

289. McIntyre was willing to cooperate with law enforcement, but was "petrified" of the people that he was discussing.  McIntyre was fearful that his identity would be disclosed.

290. McIntyre knew that if Bulger or Flemmi learned of his willingness to cooperate with law enforcement officials, his life would be in danger.

291. Bergeron realized that the information McIntyre was providing would be significant to several law enforcement agencies and he immediately arranged for agents of the DEA and the United States Customs Service to participate in the debriefing of McIntyre.

292. In addition, Bergeron told FBI Special Agent Roderick Kennedy that McIntyre was cooperating and, among other things, of McIntyre's charges against Bulger and his associates.  At the time Bergeron contacted Kennedy, Kennedy knew that Bulger and Flemmi were Connolly's informants.

293. At the time of Bergeron's contact, Kennedy was aware of the Bulger/Murray relationship because in 1983 Connolly told Kennedy that Bulger had disclosed that he had extorted $60,000 to $90,000 from Murray, because Murray was storing marijuana in a warehouse in South Boston, which was part of Bulger's territory.  Although Kennedy was the FBI's operational liaison with other agencies concerning narcotics matters and had participated with the DEA in a raid of the specific warehouse that Murray owned, Kennedy did not share this information with the DEA or with any

prosecutors working on the case in violation of the
Attorney General Guidelines.

294. Kennedy subordinated the interest of investigations in
which he was involved to the interest that Connolly and the
FBI had in maintaining Bulger and Flemmi as sources.

295. Kennedy, with a customs agent, interviewed McIntyre on
or about October 17, 1984.  With regard to drugs, McIntyre
told Kennedy that "an individual named Whitey, who operates
a liquor store in South Boston [had become] partners with
Joe Murray" Kennedy recognized this as a reference to
Bulger.  McIntyre agreed to fully cooperate with the FBI
and Customs Service.  Kennedy reported the information that
he had received from McIntyre to his FBI supervisor,
Greenleaf.

296. Connolly was present when FBI Agents discussed
McIntyre's cooperation with law enforcement.

297. In or about October and November 1984, members and
associates of the Bulger Group learned that John McIntyre
was cooperating with law enforcement officials including
agents of the Federal Bureau of Investigation and the
United States Customs Service concerning illegal activities
of the Bulger Group.  These illegal activities included the
illegal shipment of arms and ammunition aboard the fishing
trawler Valhalla to elements of the Irish Republican Army

in Ireland in September of 1984 and the illegal

distribution of drugs by members and associates of the

Bulger Group, including the importation of approximately

thirty-six tons of marijuana into Boston harbor on board

the vessel Ramsland, which had been seized by federal

authorities on or about November 14, 1984.

298. On or about November 30, 1984, because he was

cooperating with the FBI, McIntyre was kidnapped, tortured

and murdered by Bulger, Flemmi, Weeks and others.

**S.   With the Downfall of LCN-Boston, And the Murder of
Several Informants, Bulger and Flemmi Are Free to Expand
The Bulger Group's Criminal Activities**

299. The arrest and prosecution of the members of LCN

allowed Bulger and Flemmi to expand their criminal

activities.

300. The murder of McIntyre assured Bulger and Flemmi that

McIntyre would not be providing to law enforcement

information about Bulger's and Flemmi's criminal

activities.

301. One of Morris' informants reported that Flemmi was

"taking over, the LCN bookmakers and numbers agents, and

that the LCN was not able to do anything to stop him." The

FBI made no effort to investigate these allegations.

302. In July 1986, despite knowledge of Flemmi's increased criminal activity, FBI-Boston requested authority from FBI headquarters to reopen Flemmi as an informant.

303. In November 1986, James Ahearn became Special Agent in charge of the Boston Office of FBI.  Ahearn asked his assistant Special Agent Lawrence Potts to conduct a "suitability review" of Bulger and Flemmi.

304. At that time, the FBI Manual established criteria to be taken into consideration in conducting a suitability review.  In conducting his review, Potts did not consider the range of factors prescribed by the FBI Manual and failed to weigh the "productivity" of these two informants against the seriousness of the threat posed by the crimes Bulger and Flemmi were understood to e committing, and had committed.

305. In violation of the rules and regulations Potts failed to review the administrative portion of Bulger's and Flemmi's files or information provided by other sources concerning their criminal activity.

306. In violation of the FBI Manual that required FBI headquarters review at least annually the determination by a field office an individual's suitability to serve as an informant, the information was never provided to the FBI headquarters and the review never took place.

307. During Ring's tenure as supervisor of the Boston office, the FBI was involved in the investigation of payoffs to members of the Boston Police Department.  In the course of that investigation, FBI agents obtained the cooperation of a Boston Police Lieutenant, James Cox.  It was decided to have Cox attempt to record conversations with Flemmi and Bulger.

308. In or about August or September 1988, Connolly told Bulger and Flemmi that Cox was cooperating with the FBI.

309. Connolly inserted false information into Flemmi's file in order to disguise his improper conduct in leaking information to Bulger and Flemmi of Cox's willingness to cooperate.

310. As the pay-off investigation evolved, one John Bahorian, a bookmaker, was believed to be making payments to Flemmi.  Special agents were preparing an application for electronic surveillance of Bahorian, which targeted Flemmi as well.

311. Morris was afraid that the electronic surveillance would lead to Flemmi's arrest and indictment.  Morris was concerned that if that occurred, the nature of his relationship with Bulger and Flemmi would be revealed. Thus, Morris asked Connolly to tell Flemmi and Bulger to stay away from Bahorian.  Morris also asked Connolly to

tell Bulger and Flemmi not to do anything to Bahorian because Morris "did not want another Halloran."

312. Connolly delivered Morris's message to Bulger and Flemmi.  He later reported to Morris that Bulger and Flemmi wanted to meet with him to discuss the Bahorian matter.

313. In the spring of 1988, prior to the inception of electronic surveillance of Bahorian, Bulger, Flemmi and Connolly met with Morris at his home.  Morris told Bulger and Flemmi about the electronic surveillance plan and warned them to stay away from Bahorian.

314. Bahorian's telephone was wiretapped  from June 22 to September 5, 1988.  The wiretap produced evidence that lead to the indictment of Bahorian and others.  Flemmi was neither intercepted, nor charged.

315. By September 1988, many - including law enforcement officers, both state and federal - were questioning how it was that Bulger, a notoriously violent career criminal had eluded successful investigation for so long.  This reached a climax, of sorts, on the heels of yet another a frustrated law enforcement attempt to capture Bulger on a "bug."

316. On September 20, 1988, The Boston *Globe* ran a feature story, penned by the Globe Spotlight Team, captioned:  "*Law Enforcement Officials' Lament About An Elusive Foe:  Where*

*Was Whitey?"* Among the matters reported was an

extraordinary public comment – in the form of a vigorously

explicit denial – made by FBI-Boston's Special Agent in

Charge – when he was asked on the record as to whether

Bulger had certain "relations" with FBI-Boston.  The

article, in pertinent part, reads as follows:

> State Police Officials felt so strongly that
> someone within the FBI had tipped the mobsters about the
> bug that, in an unprecedented case of fingerpointing, they
> asked the FBI to conduct an internal inquiry.  The FBI
> cleared two agents, and the FBI leadership remains outraged
> at the suggestion that any of it own would engage in that
> kind of treachery.
>
> James F. Ahearn, special agent in charge of the
> FBI in Boston, was unequivocal when asked last month <u>if
> Bulger has had relations with the FBI that have left him
> free of its scrutiny</u>.
>
> "That is <u>absolutely untrue</u>," said Ahearn.  "We
> have not had evidence that would warrant it, and <u>if we do
> develop</u> anything of an evidentiary nature, <u>we will pursue
> it</u>.  We <u>specifically deny</u> that there has been special
> treatment of this individual."  He declined  to make any
> further comment on the matter and <u>instructed Connolly not
> to speak on the subject</u>.


Boston *Globe*, "Metro" Section, September 20, 1988

(emphasis supplied).



**T.   Ring, Connolly and Others at FBI-Boston Continue to
Act In Violation of the Attorney General's Informant
Guidelines.**

317. On June 13, 1989, The Boston *Herald* published an article by Shelly Murphy headlined "Ex-Con Seen as Hub Mob's Heir Apparent."  The article contained accurate information (that had been provided to Connolly by informant) that Salemme was taking over the Boston LCN's loan sharking and gambling activities when other members of the Boston LCN were indicted  The Boston Herald article cited "law enforcement sources" and accurately reported that certain "local mob leaders" were to be indicted and that Salemme had been "made" a member of the Patriarca Family.

318. Connolly was the source of information for this article.

319. On June 16, 1989, three days after it was published, Salemme was shot, but not killed and another member of the LCN, Grasso, was murdered in Connecticut.

320. Bulger and Flemmi had an interest in the murder of Salemme – an enhanced opportunity to profit from the vacuum created by the decimation of the LCN in Boston.

321. John Mercurio became an informant for Connolly and was a source of some of the information in the Boston Herald article.

322. On August 2, 1989, another informant, who Ring regarded as highly reliable, advised that Mercurio played a

central role in the Salemme shooting.  The informant
stated, among other things, that Mercurio had fled after
the shooting because he had lured Salemme to the meeting at
which the attempt on Salemme's life was made.

323.  Ring believed that this information was true and that
Mercurio had previously failed to inform the FBI of plans
for imminent violent activity in which he was involved.
Ring also recognized that there were enduring threats of
additional violence about which Mercurio would be
knowledgeable because of his involvement.

324.  The Attorney General Guidelines, which were
incorporated in the FBI Manual, required a special review
process if an FBI field Office wanted to keep an informant
open after it learned that he had participated in a serious
act of violence or any other serious crime.  FBI
headquarters and the Assistant Attorney General should have
been advised that the Boston office had credible
information concerning Mercurio's involvement in the Grasso
murder and the Salemme shooting.  The Boston FBI including
Ahearn, however, did not provide the required notification
to headquarters or the Department of Justice as required by
the Guidelines.

325.  Instead, the Boston office of the FBI arrogated to
itself the decision to continue to utilize Mercurio as an

83

informant, despite the fact that it was believed that he had, while as an informant, been involved in murder and attempted murder.

326. When a federal prosecutor learned of the reliable report of Mercuiro's involvement in the Salemme shooting, she asked Ring whether it presented a problem under the Attorney General's Guidelines.  Ring lied to her and told her that it did not.

327. Contrary to the FBI Rules and Guidelines, Ring and Connolly informed Mercurio of an electronic surveillance and permitted him to flee prior to his being indicted.

328. On or about October 30, 1989, Mercurio fled the jurisdiction and became a fugitive.

329. In allowing Mercurio to flee prior to indictment, Ring and Connolly avoided the risk that the prosecution of LCN members would be jeopardized by the issues that would have been presented by Mercurio's dual status as a defendant and an FBI source concerning criminal activity.  Mercurio's flight also masked the violation of the Attorney General's Guidelines committed by Ring and Ahearn when they decided to continue Mercurio as an informant despite his perceived involvement in the Salemme shooting, without consulting FBI headquarters and the Assistant Attorney General.

**U.    Connolly Retires, but the "Conspiracy of Silence"
Continues**

330. In or about December 1990 and on "short notice,"
Connolly retired from the BFI.  By this time, Connolly had
enjoyed a successful career as an FBI agent, based largely
on his handling of Top Echelon informants.  On December 3,
1990, and as a result of Connolly's retirement, the Agency
administratively closed Flemmi and Bulger as informants.

331. By 1992, however, the United States Attorney's Office
had begun a grand jury investigation targeting Bulger and
Flemmi, among others.

332. In the years immediately preceding presentment by the
U.S. Attorney of an indictment naming Bulger and Flemmi,
the FBI kept secret from the U.S. Attorney information
concerning Bulger's and Flemmi's longstanding informant
relationship with the FBI.  This silence continued,
unabated, until January 9, 1995, four days after Flemmi's
arrest and the day before the U.S. Attorney was to present
for a federal grand jury's consideration, an indictment
naming Flemmi and Bulger.

333. Connolly, who was no longer employed by the Bureau,
was able to monitor the progress of the grand jury
investigation and keep Bulger and Flemmi advised of its
developments.  Connolly knew that Bulger and Flemmi were

targets of the grand jury investigation and often discussed it with each of them, particularly Bulger.

334. Connolly's enduring relationship with members of the Organized Crime Squad gave him access to some information concerning the ongoing investigation of Bulger and Flemmi.

335. In early January 1995, Connolly alerted Flemmi and Bulger that on January 10, 1995, the US. Attorney would ask a federal grand jury in the District of Massachusetts to issue an indictment in the case subsequently captioned *United States v. Francis P Salemme.*

336. On or about January 4, 1995, in connection with the case subsequently captioned *United States v. Salemme, et al*, CR. 94-10287-MLW(D.Mass), arrest warrants were issued for Flemmi, Bulger and others.

337. On or about January 5, 1995, Salemme fled the District of Massachusetts.  On or about August 12, 1995 in West Palm Beach, Florida, law enforcement officers took Salemme into custody.

338. On or before January 5, 1995, Bulger fled the District of Massachusetts.  He remains a fugitive.

339. On or about January 23, 1995, Bulger returned briefly to the Boston area to drop off Theresa Stanley, with whom he had been romantically involved for 30 years.  It was widely known that Stanley had been traveling with Bulger

and was back in Boston.  Yet, the FBI did not contact her

until April, 1996, fifteen months after she had returned to

the Boston area.

340. By the time FBI-Boston interviewed Stanley, any

information she could provide was dated and had

correspondingly diminished value.  Nevertheless, the FBI

paid Stanley $1,000 in November 1996 - an amount also paid

to Halloran's widow after Halloran's murder in 1982.

341. Connolly was not interviewed in the Bulger fugitive

investigation until March 21, 1997, more than two years

after Bulger fled.

342. Connolly and Morris were upset that Bulger and Flemmi

had been indicted.  Connolly stated that he had known

Bulger since they were both boys and Bulger had bought him

an ice cream cone.  Connolly stated that he "hoped that

Bulger was never caught."  "At least he kept his end of the

bargain."  With regard to the government, Connolly

wondered, "what ever happened to keeping your word."

343. According to Connolly, the "FBI knew what [Flemmi and

Bulger] were.  They didn't have a paper route when [the

FBI] first met them.  All … Top Echelon informants are

murderers.  The government put me in business with

murderers."  Connolly further stated that "charging Bulger

and Flemmi with gambling and loan sharking was a betrayal

of the promises made to [them]."  However, the minute

[Connolly] told [the government] that [he] would testify to

the fact that thee people were authorized to run a gambling

and loansharking business, the [government] did not want to

hear from [him]."

344. On December 22, 1999, in the United States District

Court for the District of Massachusetts, John J Connolly,

James Bulger, and Stephen Flemmi were indicted.  *United

States v Connolly,* Criminal Number 99-10428-JLT.  On or

about October 11, 2000, a Superseding Indictment was filed

against Connolly and Flemmi in the United States District

Court for the District of Massachusetts, 99-10428-JLT.

345. According to reports published in The Boston Globe on

June 27, 2000, Connolly, through his attorneys, maintains

he was authorized by his superiors at the FBI to undertake

conduct alleged in the indictment alleged in the previous

paragraph:  "it is clear that Mr. Connolly was authorized

to commit all of the acts he committed with respect to

informants.  He was authorized to tell them to commit

crimes.  He was authorized to look the other way.  He was

authorized not to press them for information about their

criminal conduct."

## VI.   CLAIMS FOR RELIEF

### Count I

### (Fourth and Fifth Amendments) Conspiracy Pre-Callahan Murder: "To Protect Bulger's and Flemmi's Status as Top Echelon Informants" Defendants:  Bulger; Flemmi; Rico; Connolly; Morris and Fitzpatrick (M.G.L.c. 229, §§ 2 and 6)

346. Plaintiffs hereby repeat and reallege the allegations contained within paragraphs 1 through 345 of the Complaint as if fully set forth herein.

347. From in or about 1969 and continuing hereafter up to August 2, 1982, in the District of Massachusetts and elsewhere, defendants Rico, Connolly, Morris and Fitzpatrick, while acting under color of federal law and within the course and/or scope of their office or employment as federal agents with the FBI, an agency of the defendant United States, together with defendants Bulger and Flemmi, combined, conspired, confederated and agreed to unlawfully protect Bulger and Flemmi from investigation, arrest and prosecution for their criminal activities, in exchange for Bulger's and Flemmi's agreement to provide information pertaining to the criminal activities of others to the FBI.

348. It was the object of the conspiracy to protect defendants Bulger and Flemmi from investigation, arrest and prosecution in order to maintain their roles as Top Echelon

89

informants, providing information to the FBI.   In
furtherance thereof, defendants Rico, Morris, Connolly and
Fitzpatrick, variously, and among other things, either
intentionally or with deliberate indifference as to the
constitutional rights of Decedent and plaintiffs:   (a)
provided Bulger and Flemmi with confidential law
enforcement information regarding grand jury
investigations, court authorized wire taps and other
investigative efforts, including the identities of
confidential informants who were providing information
about Bulger and Flemmi; (b) deflected and squelched
prosecutions and criminal investigations about Bulger's and
Flemmi's crimes; (c) improperly preserved Bulger's and
Flemmi's status as FBI informants through the filing of
misleading official reports and failed to report and record
allegations of their crimes in official FBI documents; (d)
improperly failed to supervise and review Bulger's and
Flemmi's criminal activities; (e) deceived or otherwise
made misrepresentations to other concerning the criminal
activities of Bulger and Flemmi; and (f) failed to follow
the Attorney General Guidelines governing use and handling
of Top Echelon informants.

349. The foregoing conspiracy, between certain of the
Federal Defendants and others acting in concert with such

Federal Defendants, gave rise to a reasonably foreseeable risk of harm to others, including Decedent, to wit:  Bulger and/or Flemmi, two notorious, career criminals with demonstrated capacities and propensities for violence, so protected and correspondingly emboldened by way of this illicit "special relationship," would form the reasonably foreseeable belief, as a direct and natural consequence thereof; that Bulger and Flemmi could, with near impunity, respond with great violence to any and all others actually posing, or perceived by Bulger and/or Flemmi as posing, any threat of any kind to Bulger and/or Flemmi.

350. Within the ambit of risk of harms foreseen and reasonably to be foreseen, as a direct and natural consequence of the foregoing conspiracy, were those harms suffered by Decedent and Plaintiffs, including violation of Decedent's constitutional rights to be secure in his person and not to be deprived of his life without due process of law, all in violation of the Fourth and Fifth Amendments, respectively, to the US. Constitution.

351. By reason of such conspiracy, therefore, defendants Bulger, Flemmi, Martorano, Rico, Morris, Connolly, and Fitzpatrick are liable to Plaintiffs and the Callahan Estate, variously, for all damages suffered as a consequence thereby, to include, without limitation, (a)

the fair monetary value of Decedent to Plaintiffs and the

Callahan Estate, including but not limited to compensation

for the loss of reasonably expected net income, services,

protection, care, assistance, society, companionship,

comfort, guidance, counsel and advice of Decedent to

Plaintiffs; (b) punitive damages; (c) reasonable funeral

and burial expenses; (d) all damages for Decedent's

conscious suffering in the moments immediately preceding

his brutal murder (all pursuant to M.G.L. c. 229, §§ 2 and

6); and each Plaintiff's pain and anguish suffered as a

direct and natural consequence thereof.

### Count II

### (Fifth Amendment) Claims –
### Defendants:  Morris; Connolly, Fitzpatrick; and John Does

352. Plaintiffs hereby repeat and reallege the allegations

contained within paragraphs 1 through 351 of the Complaint

as if fully set forth herein.

353. Federal Defendants Morris, Connolly, Fitzpatrick and

John Does, while acting under color of law of the United

States and with deliberate indifference to Decedent's

constitutional rights, denied John Callahan his clearly

established substantive due process right not to be

deprived of life and liberty without due process of law, as

92

guaranteed by the Fifth Amendment to the United States
Constitution

354. In this respect, Federal Defendants, Morris, Connolly
and Fitzpatrick, variously, continued to utilize Bulger and
Flemmi as Top Echelon informants; failed to investigate,
prosecute or otherwise ring a halt to the known criminal
activities of their informants, Bulger and Flemmi; failed
to enforce the Attorney General Guidelines governing high
echelon informants, including Bulger and Flemmi; in
violation of the regulations and policy of the United
States failed to inform the appropriate law enforcement or
prosecutive authorities of the criminal activities of
Bulger and Flemmi; and, notwithstanding the foregoing,
continued to allow Connolly to remain Bulger and Flemmi's
contact agent, or "handler."

355. These actions and omissions, undertaken with
deliberate indifference to Decedent's constitutional
rights, violated John Callahan's clearly established
substantive due process rights not to be deprived of life
or liberty without due process of law, guaranteed by the
Fifth Amendment to the United States Constitution.

356. As a direct, proximate, and foreseeable result of the
actions of the above Federal Defendant, Decedent was, a
alleged, denied his constitutional rights pursuant to the

Fifth Amendment to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

357. The actions and omissions of the above Federal Defendants, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken with deliberate indifference and/or reckless disregard for their likely consequences.  Plaintiffs and the Callahan Estate are thus entitled to an award of punitive damages.

## Count III

## (Fourth Amendment) Claim - Defendants:  Connolly; Morris; Fitzpatrick; And John Does

358. Plaintiffs hereby repeat and reallege the allegations continued within paragraphs 1 through 357 of the Complaint as if fully set forth herein.

359. Federal Defendants Morris, Connolly, Fitzpatrick and John Does, while acting under color of law of the United States and with deliberate indifference to Decedent's constitutional rights, denied John Callahan his clearly established substantive due process right to be secure in his person against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution.

360. In this respect, Federal Defendants Morris, Connolly and Fitzpatrick, variously, continued to utilize Bulger and Flemmi as Top Echelon informants; failed to investigate, prosecute or otherwise bring a halt to the known criminal activities of their informants, Bulger and Flemmi; failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; in violation of the regulations and policy of the United States failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; and, notwithstanding the foregoing, continued to allow Connolly to remain Bulger and Flemmi's contact agent, or "handler."

361. These actions and omissions, undertaken with deliberate indifference to Decedent's constitutional rights, violated John Callahan's clearly established right to be secure in his person against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution.

362. As a direct, proximate, and foreseeable result of the actions and omissions of the above Federal Defendants, Decedent was, as alleged, denied his constitutional rights pursuant to the Fourth Amendment to the United States

Constitution, and suffered extreme and sever fright, shock, fear, horror, emotional stress and wrongful death.

363. The actions and omissions of the above Federal Defendants, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken with deliberate indifference and/or reckless disregard for their likely consequences.  Plaintiffs and the Callahan Estate are thus entitled to an award of punitive damages.

### Count IV

### "Wrongful Death" – "Willful, Wanton, Reckless" – Defendants:  Bulger, Flemmi Martorano; Rico; Connolly; Morris; and United States
### (M.G.L.c. 229, § 2)

364. Plaintiffs hereby repeat and reallege the allegations contained within paragraphs 1 through 363 of the Complaint as if fully set forth herein.

365. By reason of the aforesaid willful and wanton conduct of defendants Bulger, Flemmi and Martorano, and the willful, wanton and/or reckless conduct and/or omissions, variously, of Federal Defendants Rico, Morris, Connolly and Fitzpatrick, such conduct and/or omissions substantially contributing to or otherwise proximately causing the harms complained of herein, defendants Bulger, Flemmi and Martorano are directly liable; Federal Defendants Rico, Connolly, Morris are directly liable; and the United States

is both vicariously and directly liable, to Plaintiffs and

the Estate, variously, for (a) the fair monetary value of

Decedent to Plaintiffs and the Estate, including but not

limited to compensation for the loss of reasonably expected

net income, services, protection, care, assistance,

society, companionship, comfort, guidance, counsel and

advice of Decedent to Plaintiffs; (b) punitive damages; and

(c) reasonable funeral and burial expenses, all pursuant to

M.G.L.c. 229, § 2.

### Count V

### Civil ("Wrongful Death") Conspiracy - "Willful and Wanton"
### Defendants:  Bulger, Flemmi, Martorano
### (MGL.C. 229, § 2)

366. Plaintiffs hereby repeat and reallege the allegations

contained within paragraphs 1 through 365 of the Complaint

as if fully set forth herein.

367. Beginning in or about 1980 and until on or about May

27, 1981, Bulger, Flemmi, Martorano and others conspired,

confederated, combined and agreed to unlawfully take the

life of another human being, without justification, to wit,

John Callahan.

368. In furtherance of the foregoing conspiracy, and in or

about May, 1981, defendants Bulger and/or Flemmi directed

Martorano and another member of the Bulger Group to travel

to Florida, for the purpose of lying in wait for and

97

ambushing John Callahan, then and there to kill John
Callahan by means of deadly weapon.

369. In furtherance of the foregoing conspiracy, in or
about August 2, 1982, Martorano and another member of the
Bulger Group indeed traveled to Florida.

370. In furtherance of the foregoing conspiracy, on or
about May 27, 1981, under the direction and control of
defendants Bulger and/or Flemmi, defendant Martorano met
with John Callahan where he shot and killed the decedent.

371. By reason of the aforesaid conspiracy, defendants
Bulger, Flemmi and Martorano are liable to Plaintiffs and
the Callahan Estate, variously, for (a) the air monetary
value of Decedent to Plaintiffs and the Estate, including
but not limited to compensation for the loss of reasonably
expected net income, services, protection, care,
assistance, society, companionship, comfort, guidance,
counsel and advice of Decedent to Plaintiffs; (b) punitive
damages; (c) reasonable funeral and burial expenses; (d)
all damages for Decedent's conscious suffering in the
moments immediately preceding his brutal murder (all
pursuant to M.G.L.c. 229, §§ 2 and 6); and (e) each
Plaintiff's pain and anguish suffered as a direct and
natural consequence thereof.

**Count VI**

**"Wrongful Death"  "Willful, Wanton, Reckless' – Conscious
Suffering"
Defendants: Bulger, Flemmi; Martorano; Rico; Connolly;
Morris; United States
(M.G.L.C.229, §6)**

372. Plaintiffs hereby repeat and reallege the allegations
contained within paragraphs 1 through 371 of the Complaint
as if fully set forth herein.

373. By reason of the aforesaid willful and wanton conduct
of defendants Bulger, Flemmi and Martorano, and the
willful, wanton and/or reckless conduct and/or omissions,
variously, of Federal Defendants, Rico, Morris Connolly and
Fitzpatrick, such conduct and/or omissions substantially
contributing to or otherwise proximately causing the harms
complained of herein, Bulger, Flemmi and Martorano are
directly liable; Federal Defendants Rico, Connolly, Morris
are directly liable; and the United States is both
vicariously and directly liable to the Callahan Estate in
respect of all damages for Decedent's conscious suffering
in the moments immediately preceding his brutal murder, all
pursuant to M.GlL.c.229,§ 6, and the FTCA, 28 U.S.C. §§
1346 and 2671 et seq.

**Count VII**

**"Wrongful Death" – "Negligence"
Defendants:  Rico; Connolly; Morris;
Fitzpatrick; John Does; United States**

(M.G.L.c. 229, § 2)

374. Plaintiffs hereby repeat and reallege the allegations contained within paragraphs 52 through 353 of the Complaint as if fully set forth herein.

375. In combination with the aforesaid willful and wanton conduct of defendants Bulger, Flemmi and Martorano and by reason of the aforesaid intentional conduct and/or negligent conduct and/or omissions, variously, of Federal Defendants Rico, Morris, Connolly, Fitzpatrick and other federal actors, yet unknown to Plaintiffs, such intentional conduct and/or negligent conduct and/or omissions on the part of the aforesaid Federal Defendants substantially contributing to or otherwise proximately causing the harms complained of herein, Federal Defendants Rico, Connolly, Morris, Fitzpatrick and John Does are directly liable; and the United States is both vicariously and directly liable, to Plaintiff and the Callahan Estate, variously, for (a) the fair monetary value of Decedent to Plaintiffs and the Callahan Estate, including but not limited to compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice of Decedent to Plaintiffs; (b) punitive damages; and (c) reasonable

funeral and burial expenses, all pursuant to M.G.L.c. 229, § 2.

### Count VIII

#### "Wrongful Death" - "Negligence" - "Conscious Suffering" Defendants:  Rico; Connolly; Morris; Fitzpatrick; John Does; United States (M.G.L.c. 229, § 6)

376. Plaintiffs hereby repeat and reallege the allegations contained within paragraphs 1 through 375 of the Complaint as if fully set forth herein.

377. In combination with the aforesaid willful and wanton conduct of defendants Bulger, Flemmi and Martorano and by reason of the aforesaid negligent conduct and/or omissions of Federal Defendants Rico, Morris, Connolly, Fitzpatrick and other federal actors, yet unknown to Plaintiffs, such negligent conduct and/or omissions on the part of the aforesaid Federal Defendants substantially contributing to or otherwise proximately causing the harms complained of herein, Federal Defendants Rico, Connolly, Morris, Fitzpatrick and John Does are directly liable; and the United States is both vicariously and directly liable, to the Callahan Estate for all damages in respect of Decedent's conscious suffering in the moments immediately preceding his brutal murder, all pursuant to M.G.L.c.229, §6, and the FTCA, 28 U.S.C. §§ 1346 and 2671 et seq.

**Count IX**

**Emotional Distress -**
**Defendants:  Bulger; Flemmi; Martorano; Connolly; Morris**
**Fitzpatrick; John Does; United States**

378. Plaintiffs hereby repeat and reallege the allegations
contained within paragraphs 52 through 353 of the Complaint
as if fully set forth herein.

379. The aforesaid willful and wanton conduct of Bulger,
Flemmi and Martorano, in conspiring to lay in wait for and
to murder, and in carrying out the brutal murder of John B.
Callahan, was extreme and outrageous; beyond all possible
bounds of decency; and was utterly intolerable in a
civilized society.

380. By reason of the foregoing willful and wanton conduct,
in combination with the aforesaid intentional, reckless
and/or negligent conduct and/or omissions or other wrongful
conduct, variously, of Federal Defendants Rico, Morris,
Connolly, Fitzpatrick and other federal actors, yet unknown
to Plaintiffs, such negligent conduct and/or omissions on
the part of the Federal Defendants substantially
contributing to or otherwise proximately causing the
emotional distress suffered by Plaintiffs, Bulger, Flemmi
and Martorano are directly liable; Federal Defendants Rico,
Connolly, Morris, Fitzpatrick and John Does are directly
liable; and the United States is both vicariously and

directly liable, to Plaintiffs for all damages in respect of such emotional distress.

### Count X

**Bivens ("Post-Callahan Murder") Conspiracy to Deprive Estate and Plaintiffs of Property and Access to Courts Under First, Fourth and Fifth Amendments - Defendants:  Connolly; Morris; Fitzpatrick; Ring; Greenleaf; Ahearn; John Does**

381. Plaintiffs hereby repeat and reallege the allegations contained within paragraphs 1 through 380 of the Complaint as if fully set forth herein.

382. From in or about May, 1981 and continuing thereafter up to September, 2000 in the District of Massachusetts and elsewhere, Federal Defendants Morris, Connolly, Fitzpatrick, Ring, Greenleaf and Ahearn, while acting under color of federal law and within the scope of their office or employment as federal agents with the FBI, an agency of the defendant United States, together with their informants, Bulger and Flemmi, combined, conspired, confederated and agreed to unlawfully protect Bulger and Flemmi from investigation, arrest and prosecution for their criminal activities, in exchange for Bulger's and Flemmi's agreement to provide information pertaining to the criminal activities of others to the FBI.

383. It was the object of the conspiracy to protect defendants Bulger and Flemmi, from and after the Callahan murder, from investigation, arrest and prosecution in order to, among other things, maintain their roles as Top Echelon informants, providing information to the FBI.  In furtherance thereof, certain of Defendants Morris, Connolly, Fitzpatrick, Ring, Greenleaf and Ahearn, variously, and among other things, either intentionally or with deliberate indifference as to the constitutional rights of Decedent and Plaintiffs:  (a) provided Bulger and Flemmi with confidential law enforcement information regarding grand jury investigations, court authorized wire taps and other investigative efforts, including the identities of confidential informants who were providing information about Bulger and Flemmi; (b) deflected and squelched prosecutions and criminal investigations about Bulger's and Flemmi's crimes; (c) improperly preserved Bulger's and Flemmi's status as FBI informants through the filing of misleading official reports and/or failing to report and record allegations of their rimes in official FBI documents; 9d) improperly failed to supervise and review Bulger's and Flemmi's criminal activities; (e) deceived, shielded and/or otherwise made misrepresentations to others concerning the criminal activities of Bulger and

Flemmi; (f) failed to follow the Attorney General Guidelines governing use and handling of Top Echelon informants; and (g) deceived, shielded and/or otherwise made misrepresentations concerning FBI-Boston's long-standing "special relationship" with Bulger.

384. As a direct, proximate, foreseeable and intended result of this conspiracy, the aforesaid Federal Defendants prevented and preclude plaintiffs and the Callahan Estate from learning the predicate facts and circumstances leading up to and surrounding the murder of John B. Callahan, to include the identities of those involved and the facts and circumstances regarding the longstanding "special relationship" between the killers and FBI-Boston, thus (a) precluding them from: learning he bases of their instant claims for relief; submitting, among other things, administrative claims for relief upon the FBI, as the appropriate respondent federal agency; and proceeding thereafter to the courts, to secure civil judgments and damages, on all claims, demands and causes of action which lie against all those responsible and otherwise answerable for the murder of John B. Callahan; and (b) causing or otherwise permitting crucial evidence to have been lost, witnesses; memories to fade and/or their testimony to

otherwise become unavailable, thus substantially compromising Plaintiffs' claims.

385. By reason of the foregoing conspiracy, the aforesaid Federal Defendant's denied Plaintiffs and the Callahan Estate their clearly established constitutional rights to seek redress of grievances in the courts, as guaranteed by the First, Fourth and fifth Amendments to the United States Constitution and their respective rights not to be deprived of property without due process of law as secured by the Fifth Amendment to the United States Constitution.

386. Where the foregoing actions and omissions of the various Federal defendants, as alleged above, constituted an extreme deviation from reasonable standards of conduct, undertaken with deliberate indifference to or reckless disregard for their likely consequences, Plaintiffs and the Callahan Estate are entitled to punitive damages.

387. By reason of such conspiracy, therefore, defendants Bulger, Flemmi, Martorano and Federal Defendants Morris, Connolly, Fitzpatrick, Ring, Greenleaf, and Ahearn are liable to Plaintiffs and the Wheeler Estate, variously, for all damages suffered as a consequence thereby, to include, without limitation the monetary (time) value of such damages, lost to Plaintiffs as a direct and natural consequence of such conspiracy.

WHEREFORE, Mary Jane Callahan, Administratrix of the Estate of John B. Callahan, and the individual Plaintiffs hereby demand legal damages from the various Defendants, jointly and severally, on each Count of the Complaint for Relief as set forth herein and as to which the Defendants are named, in such amounts as shall be established at trial of this matter, and such other and further relief as follows:

B. Their costs of suit and attorneys' fees in this action;

C. Declaratory relief, under 28 U.S.C. § 2201, where, among other matters, the Honorable Court issue its Order declaring as adjudicated, for all purposes having to do with the instant claims solely as against the Defendant United States, and in such form as it deems appropriate in the circumstances:

(1) those findings of fact appearing within the "Memorandum and Order" reported at *United States v. Salemme,* 91 F.Supp.2d 141 (D.Mass. 1999);

(2) those facts and circumstances as alleged in *United States v. Kevin P. O'Neil, James J. Bulger and Stephen J. Flemmi,* 99-10371-RGS (where the United States chares Bulger, and Flemmi with, among others, Racketeering Conspiracy ("Count One"), and substantive Racketeering ("Racketeering Act Number Sixteen"), two predicate acts of

107

which are conspiracy to murder John B. Callahan, and the
murder of John B. Callahan); and

(3) those facts and circumstances as alleged in *United
States v. John J. Connolly and Stephen Flemmi*, 99-10428-JLT
(where the United States charges that Connolly was a member
of a "criminal enterprise" also including Bulger and
Flemmi; that the enterprise "acted to protect James Bulger,
Stephen Flemmi..from arrest and prosecution for criminal
activities including murder,…" and that it "acted to
facilitate those criminal activities of Bulger, Flemmi and
their associates."   Indictment at para. 13 ("Purpose of the
Enterprise").

D. Such other and further relief as the Honorable Court
deems meet and just in the premises.

   **PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
Mary Jane Callahan, John B. Callahan,
Kathleen Ellen Phelps & Patrick
Shawn Callahan
by their attorneys,


Stephen Neyman
B.B.O. # 551576


James P. Duggan
B.B.O. # 137500
160 State Street
8th Floor
Boston, MA 02109
617-263-6800

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

*Mary Jane Callahan*
*14 Maple Ridge DR*
*Burlington, MA*

**DEFENDANTS**

*United States of America et al*

FILED
IN CLERKS OFFICE

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *Middlesex*
(EXCEPT IN U.S. PLAINTIFF CASES)

02 - 12372 RCL 2: 47

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
         TRACT OF LAND INVOLVED.

U.S. DISTRICT COURT
DISTRICT OF MASS.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*Stephen Neyman*
*James Duggan*
*617 523 4222   45 State St   Boston MA*

ATTORNEYS (IF KNOWN)
*unknown*

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
     Plaintiff

☐ 3 Federal Question
     (U.S. Government Not a Party)

☒ 2 U.S. Government
     Defendant

☐ 4 Diversity
     (Indicate Citizenship of Parties
     in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                          AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
                           DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

*28 USC 2671      28 USC 1344      28 USC 1331*

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
**IF ANY**

JUDGE *Lindsay*

DOCKET NUMBER _____

DATE
*Dec 10, 02*

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) _____ *Callahan v United States* _____

FILED
IN CLERKS OFFICE

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

2002 DEC 10  P 2: 47

    ___   I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    X     II.     195, 368, 400, (440) 441-444, 540, 550, 555, 625, 710, 720, 730,       U.S. DISTRICT COURT
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       *Also complete DISTRICT OF MASS.
                                                             AO 120 or AO 121
                                                            for patent, trademark or copyright cases

    ___   III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, (360) 362, 365, 370, 371,
               380, 385, 450, 891.

    ___   IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    ___   V.     150, 152, 153.

# 02-12372RCL

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                 YES ☐     NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                 YES ☐     NO ☒

    If so, is the u.s.a. or an officer, agent or employee of the u.s. a party?

                                                 YES ☐     NO ☒

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 usc §2284?

                                                 YES ☐     NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the commonwealth of massachusetts ("governmental agencies"), residing in massachusetts reside in the same division? - (See local rule 40.1(d)).

                                                 YES ☒     NO ☐

        A.    If yes, in which division do all of the non-governmental parties reside?

             Eastern Division ☒          Central Division ☐          Western Division ☐

        B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

             Eastern Division ☐          Central Division ☐          Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                                 YES ☐     NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _____ *James P Duggan* _____

ADDRESS _____ *160 State St  Boston* _____

TELEPHONE NO. _____ *617 523 7222* _____

(Cover sheet local.wpd  - 09/12/02)